**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF INDIANA**
**Indianapolis Division**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **DEMONA FREEMAN**, | ) | |
| | ) | Case No. 12-04713-JJG-13 |
| *Debtor*. | ) | |
| | ) | |

_____

| | | |
|---|---|---|
| **DEMONA FREEMAN**, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Adversary No. |
| | ) | |
| **PHH MORTGAGE f/k/a OCWEN LOAN** | ) | |
| **SERVICING, LLC.**, and **OCWEN FINANCIAL** | ) | |
| **CORPORATION**, | ) | |
| | ) | |
| *Defendants*. | ) | |

_____

**COMPLAINT**
_____

Plaintiff, Demona Freeman ("Freeman"), by counsel, complains of Defendants, PHH Mortgage successor by merger to Ocwen Loan Servicing, LLC and Ocwen Financial Corporation, collectively ("Ocwen"), as follows:

**INTRODUCTION**

1.     Demona Freeman brings this adversary proceeding requesting that the Court enforce the discharge injunction entered in this case, find Ocwen in contempt of Court, award Freeman appropriate compensatory damages based upon the needless harm inflicted upon her, and impose sanctions against Ocwen in an amount necessary to punish it for the widespread harm it has caused Freeman and similarly situated consumers and debtors.

2.     This case arises from Ocwen's knowing, willful, intentional, and systemic failure to service consumer mortgage loan accounts in Chapter 13 bankruptcy in accordance with the requirements of the bankruptcy code and with appropriate observance and respect for the bankruptcy discharge injunction.

3.     The widespread pattern and practice of illegal mortgage servicing practices committed by Ocwen, stems from its creation, and use of the mortgage servicing platform REALServicing.

4.     Freeman contends that Ocwen continued to use REALServicing despite its knowledge that REALServicing was seriously flawed and its use by Ocwen to service consumer loans systemically caused a multitude of errors and mistakes that directly harmed consumers like Freeman and led to repeated violations of Ocwen's obligations under the Bankruptcy Code and the discharge injunction entered upon successful completion of a Chapter 13 bankruptcy case, as well as numerous national mortgage servicing standards applicable to these practices.

5.     As will be proven in this case, Freeman filed her Chapter 13 bankruptcy case, fulfilled all her obligations under her bankruptcy plan, went through the Rule 3002.1 process which confirmed she had cured her default and maintained her ongoing mortgage payments, received an order of discharge from this Court, and then was immediately cast back into default, foreclosure, and ruinous financial harms driven by Ocwen's company-wide inability to service mortgage loans in compliance with its obligations under the Bankruptcy Code.

6.     Freeman has faced foreclosure since almost immediately after the discharge was entered in this case due to Ocwen's systemic failings. Even today, after years of notice, Ocwen persists in its position that its actions are proper and maintains Freeman's mortgage loan account

2

in a state of default manufactured by Ocwen's failed mortgage servicing platform, RealServicing, and the kleptocratic leadership of Ocwen who knowingly continued to use this platform until forced to change by massive state and federal regulatory pressure.

7.     Even after being forced to change platforms in 2019, Ocwen simply transferred its faulty, unreliable, and inaccurate records into its new servicing platform and continues to violate this Court's discharge injunction every day with respect to Freeman's bankruptcy case.

8.     Because Ocwen's senior management knew of the issues with RealServicing going back to at least 2009 - and indeed profited individually from the maintenance of that flawed platform - yet, repeatedly failed to take action to prevent harm to consumers like Freeman, and defied efforts by federal and state regulators to compel changes, this case seeks to hold Ocwen accountable for actual damages and to impose appropriate coercive sanctions sufficient to hold Ocwen accountable, force it to change or cease its corporate existence.

### JURISDICTION AND VENUE

9.     This is a core proceeding arising out of the above-captioned Chapter 13 case and under Title 11 of the United States Code.

10.     This Court has both personal and subject matter jurisdiction pursuant to 28 U.S.C. §§ 157(b)(2) and 1334.

11.     This matter entails a core proceeding and therefore this Court has jurisdiction to enter a final order with respect to those issues, with respect to the non-core issues, Freeman consents to the entry of a final order in this case by the Bankruptcy Judge.

12.     Venue lies in this District pursuant to 28 U.S.C. § 1391(b).

### PARTIES

13.     Ocwen is a subsidiary of Ocwen Financial Corporation.

14.     Ocwen Financial Corporation is a financial services holding company, which,

3

through its subsidiaries, services consumer mortgage loan accounts. Ocwen Financial Corporation has published and maintains a website, www.Ocwen.com, where it states:

> About Us
>
> Ocwen Financial Corporation (NYSE: OCN) is a leading non-bank mortgage servicer and originator providing solutions through its primary brands, PHH Mortgage and Liberty Reverse Mortgage. PHH Mortgage is one of the largest servicers in the country, focused on delivering a variety of servicing and lending programs. Liberty is one of the nation's largest reverse mortgage lenders dedicated to education and providing loans that help customers meet their personal and financial needs. Ocwen and its subsidiaries are committed to helping homeowners and delivering exceptional service and value to customers, clients and investors. [1]

15.    At all times relevant, Ocwen acted as the authorized agent for servicing, partial assignee of, and mortgage servicer for, Federal Home Loan Mortgage Corporation ("Freddie Mac") with respect to Freeman's mortgage loan account.

16.    Demona Freeman is the debtor in this underlying bankruptcy case and the plaintiff in this adversary proceeding.

### FACTUAL ALLEGATIONS RELATED TO FREEMAN'S CHAPTER 13

17.    In 2008, Freeman began encountering financial difficulties as a reverberation of the financial collapse brought on by the mortgage industry.

18.    On April 13, 2009, New York Mellon filed a foreclosure action against Freeman in the Hamilton County Superior Court No. 1 (Cause No. 29D01-0904-MF-000484) (the "First Foreclosure Case").

19.    Freeman sought to stop the forced sale of her home by filing for Chapter 13 bankruptcy protection.

---

[1] *About Us*, OCWEN, https://www.ocwen.com/About (last visited December 21, 2020, 8:05AM CST).

20.     Freeman filed her Chapter 13 bankruptcy case on April 23, 2012, in the United States Bankruptcy Court for the Southern District of Indiana (Case No. 12-04713-JKC-13)  (the "Bankruptcy Case").

21.     Shortly after filing, Freeman proposed a Chapter 13 Plan [Filing No. 2] (the "Chapter 13 Plan"), which was confirmed on April 10, 2013, and later modified by Order pursuant to 11 U.S.C. § 1329 on March 15, 2016.

22.     Pursuant to the Chapter 13 Plan, Freeman was to make regular monthly payments of $1,740.00 to the Chapter 13 Trustee, from which Ocwen would receive approximately $1,029.00 per month to maintain the monthly payments it was owed, plus an additional sum to address all arrearage (originally estimated by Freeman to be $15,000.00).

23.     Ocwen appeared in the Bankruptcy Case and participated in those proceedings by filing a Proof of Claim (Claim No. 8 dated July 26, 2012) [Claim Filing No. 8-1] on behalf of New York Mellon.

24.     The Proof of Claim asserted a secured claim in the amount of $133,064.46 and an arrearage claim of $22,668.03, which included: (a) escrow charges of $6,649.43; (b) a transferred fee balance of $2,328.05; (c) property valuation fees of $121.00 (listed twice for a total of $242.00); (d) foreclosure fees of $225.00; (e) foreclosure costs of $695.36; and (f) a proof of claim fee of $150.00.

25.     On September 13, 2012, the United States Trustee filed an Objection to Claim [Filing No. 47], detailing approximately three pages of errors in Ocwen's Proof of Claim, including unsubstantiated, and thus objectionable, charges contained within.

26.     Within the Objection to Claim, the United States Trustee also states: "Further, based on a review of claims filed by Ocwen Loan Servicing, LLC. in the Southern District of

Indiana, the United States Trustee believes this failure occurs in nearly every proof of claim filed by Ocwen and is systematic in nature."

27.    Ocwen did not respond to the Objection to Claim.

28.    On October 26, 2012, the Bankruptcy Court entered the Order on United States Trustee's Objection to Claim Number 8 Filed by Ocwen Loan Servicing, LLC. [Filing No. 53], disallowing the objected to, and unsubstantiated, fees, expenses, and charges totaling $10,289.84 as well as any fees for preparation of the Proof of Claim or amendments thereto.

29.    The Order allowed the balance of Ocwen's Proof of Claim, which was an arrearage in the amount of $12,378.10.

30.    On November 13, 2013, unwilling to forego collection of the monies previously disallowed, Ocwen filed its Motion to Reconsider and Motion for Leave to File an Amended Claim ("Motion to Reconsider") [Filing No. 57].

31.    On December 5, 2012, the United States Trustee filed an Objection to the Motion to Reconsider [Filing No. 59], highlighting Ocwen's failure to respond to the original Objection to Claim let alone meet the requisite cause to permit the filing of an amended claim.

32.    On January 14, 2013, the Court conducted oral argument for and against the Motion to Reconsider.

33.    Ocwen and the United States Trustee both appeared by counsel.

34.    On January 22, 2013, the Bankruptcy Court entered an Order [Filing No. 69], denying Ocwen's Motion to Reconsider.

35.    On February 22, 2013, still unwilling to forego collection of unsubstantiated fees, Ocwen filed a Notice of Postpetition Fees, Expenses and Charges under Claim Number 8 on the Claims Register ("Fee Notice") to supplement its original Proof of Claim, a portion of which had

been disallowed.

36.     In the Fee Notice, Ocwen listed a "Bankruptcy Fee," dated January 17, 2013, in the amount of $300.00.  Attached to the Fee Notice was an invoice that provided further detail regarding the "Bankruptcy Fee."  The invoice indicates the fee (which was to be assessed to Freeman's account) related to a "Response to Objection to Claim – (Rec from Brwr)."

37.     As set forth above, Ocwen did not file a response to the Trustee's Objection to Claim.

38.     In response to the Fee Notice, the United States Trustee filed a Motion For Determination of Post-Petition Fees, Expenses, or Charges [Filing No. 80] ("Motion For Determination"), stating: "12. A review of the case docket indicates that [Ocwen] failed to respond to the Claim Objection. Thus any fees for a Response to Objection to Proof of Claim are improper and should be disallowed entirely."

39.     Just as it did not respond to the Trustee's Objection to Claim, Ocwen failed to file a response to the Trustee's Motion for Determination.

40.     Nonetheless, the Bankruptcy Court set the Motion for Determination for hearing on April 2, 2013.

41.     Proper notice of the hearing was issued to Ocwen.

42.     Ocwen failed to appear at the hearing on April 2, 2013.

43.     On April 8, 2013, the Bankruptcy Court entered its Order Granting the Trustee's Motion for Determination [Filing No. 85], disallowing the $300.00 fee described above and stating the following: "All fees relating to the Proof of Claim filed by [Ocwen] in this case ("Proof of Claim"), amendments to the Proof of Claim, or any litigation relation to the Proof of Claim or future matters that relate to the United States Trustee's litigation in this case, including

the Motion for Determination, are hereby disallowed and may not be charged to Debtor's

mortgage account."

44.     On April 12, 2017, the Chapter 13 Trustee filed a Notice of Final Cure Payment

[Filing No. 109] pursuant to FRBP § 3002.1(f), stating the amount to cure the prepetition default

($12,378.19 in arrearage) had been paid in full and that Freeman had completed all payments

required under the plan.

45.     On April 24, 2017, Ocwen filed a Response to Notice of Final Cure Payment

[Filing No. doc] under Claim Number 8 on the Claims Register "[agreeing] that the Debtor(s)

have paid in full the amount required to cure the prepetition default on the creditor's claim."

46.     Within the same document, under the penalties for perjury, Ocwen affirmed

Freeman was current with all post-petition payments consistent with §1322(b)(5) of the

Bankruptcy Code including all fees, charges, expenses, escrow, and costs.

47.     Per the Response to Notice of Final Cure Payment, Freeman was to make her next

post-petition payment on May 1, 2017.

48.     Per the Response to Notice of Final Cure Payment, Freeman was henceforth

current on her mortgage obligation and was to continue making her regular monthly installment

directly to Ocwen beginning on May 1, 2017.

49.     Beginning in May of 2017, Freeman commenced making timely and adequate

monthly installment payments on the Loan to Ocwen by a series of ACH debits.

50.     On November 21, 2017, Freeman obtained an Order of Discharge.

51.     Per the Chapter 13 Plan, the Order of Discharge, and in light of the Response to

Notice of Final Cure Payment, Freeman's mortgage was to be reinstated according to the original

terms and any right of Ocwen, as mortgage servicer and agent of the owner of the mortgage loan

account, to recover any amounts alleged to have arisen prior to her filing for bankruptcy was thereby extinguished.

52.     However, unbeknownst to Freeman, the United States Trustee, the Chapter 13 Trustee and this Court, Ocwen is institutionally incapable of servicing mortgage loan accounts in Chapter 13 bankruptcy (both during the case and post-discharge) in compliance with the legal obligation imposed by the Bankruptcy Code and national mortgage servicing standards governing Ocwen's obligations to properly service mortgage loan accounts.

### FACTUAL ALLEGATIONS RELATED TO CONDUCT SUBSEQUENT TO FREEMAN'S CHAPTER 13

53.     On February 21, 2018, despite Freeman being contractually current on the Loan, making all required direct payments since completion of her plan payments, and having received the Court's Order of Discharge, New York Mellon, filed a Notice of Relief from Stay and Abandonment in the First Foreclosure Case ("Notice of Relief from Stay").

54.     The decision to file the Notice of Relief from Stay was, at least in part, based upon information provided to New York Mellon from Ocwen.

55.     In the Notice of Relief from Stay, New York Mellon states: "Further, the property at issue has been abandoned from the bankruptcy estate under 11 U.S.C. § 554."

56.     As this Court's docket clearly shows, Freeman's home, referenced in the Notice of Relief from Stay, had not been abandoned from the bankruptcy estate.

57.     The filing of the Notice of Relief from Stay had the effect of restarting the First Foreclosure Case, *post-discharge,* and after the loan was brought current, and there was no default upon which a foreclosure could be based.

58.     On March 6, 2018, following receipt of one or more messages from Freeman's bankruptcy counsel, a senior paralegal with counsel for New York Mellon in the First

Foreclosure Case stated: "After review, the attorney has determined that our foreclosure case should be closed, as you said."

59.    On May 2, 2018, almost two months later, New York Mellon, by counsel, filed a Motion to Vacate Judgment and To Dismiss Case Without Prejudice.

60.    On May 5, 2018, the First Foreclosure Case was dismissed.

61.    Sometime in June of 2018, Freeman obtained an exact reproduction of the life of loan mortgage transactional history ("Life of Loan History") for the Loan from the system of record used by Ocwen.

62.    The Life of Loan History reflects the current mortgage balance, the date of receipt and application of all payments, the date of assessment for any late fees or charges, and the recording of any corporate advances for any legal fees or charges, including without limitation property inspection fees, legal fees, escrow fees, processing fees and any other collateral charges.

63.    The Life of Loan History reflects that, during Freeman's ongoing Chapter 13 Bankruptcy Case, Ocwen assessed fees and expenses, some of which were applied to Freeman's mortgage account as a debit and others that were applied and then reversed.

64.    Ocwen did not provide notice of the charging of these fees and expenses to Freeman's account as required by FRBP § 3002.1.

65.    Those fees and expenses applied to Freeman's mortgage (i.e., fees and expenses paid by Ocwen to Ocwen from funds that should have been applied to principal, interest, or escrow) include $6,649.43 in escrow charges specifically disallowed in the Bankruptcy Case by this Court's October 26, 2012 at Doc. 53.

66.    In addition, the Life of Loan History reflects that during Freeman's Bankruptcy Case and thereafter, Ocwen maintained a large balance of unapplied funds in a suspense account.

10

The highest balances were $5,860.92 on October 7, 2013; $4,452.41 on February 7, 2014; $3,479.00 on June 2, 2014; $4,020.39 on September 4, 2014; $3,588.37 on December 21, 2017; $2,092.96 on February 6, 2018; and $84,910.53 on April 27, 2018.

67.    Ocwen's improper and illegal retention of these unapplied funds in a suspense account resulted in automatic charges to Freeman's account of default related fees and additional interest in violation of the Bankruptcy Code and this Court's orders.

68.    However, unbeknownst to Freeman, the United States Trustee, the Chapter 13 Trustee and this Court, Ocwen had conducted an internal investigation of its mortgage servicing failures and had determined many years earlier, that Ocwen was systematically incapable of properly applying payments received on a mortgage loan account in a Chapter 13 bankruptcy proceeding and incapable of properly accounting for monies had and received on the account of debtors in a Chapter 13 bankruptcy case.

69.    At all relevant times, Freeman continued to make timely and adequate payments each month as obligated.

70.    In addition, the Life of Loan History reflects that Ocwen's unlawful conduct included, or otherwise caused, a manufactured negative escrow balance to exist almost continuously throughout Freeman's Bankruptcy Case and thereafter.  The largest negative balances were -$8,492.21 on December 31, 2013; -$6,458.15 on May 6, 2014; -$7,396.71 on September 4, 2014; -$6,599.27 on April 7, 2015; -$5,099.73 on June 30, 2015; -$10,124.00 on December 21, 2017; and -$23,288.85 on or about February 6, 2018.

71.    An escrow account is a form of trust account maintained for the purpose of paying taxes and insurance on a mortgage loan account.  Ocwen had no right or authority to debit funds

in this manner or outside the requirements of the laws governing escrow accounts and the agreement of the parties evidenced in the mortgage and promissory note governing the loan.

72.     In addition, pursuant to the Loan, if the amount withheld in the escrow account for insurance and taxes were insufficient, Ocwen was required to notify Freeman of the shortage pursuant to the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq*.

73.     Ocwen failed to provide Freeman with notice of the shortage or explanation for the activities underpinning the negative escrow balances set forth above.

74.     By maintaining a negative escrow balance, Ocwen caused Freeman to incur fees, penalties and/or interest that she would not have otherwise.

75.     In addition, by maintaining a negative escrow balance following the conclusion of the Bankruptcy Case, Ocwen violated the discharge injunction ordered therein and deprived her of the fresh start to which she was entitled.

76.     By maintaining a negative escrow balance during the course of the Bankruptcy Case, Ocwen failed to provide notice to the Court of those alleged charges as required by FRBP § 3002.1.

77.     However, unbeknownst to Freeman, the United States Trustee, the Chapter 13 Trustee and this Court, Ocwen, during its investigation of its mortgage servicing failures, had determined that it was institutionally incapable of properly accounting for monies had and received for escrow accounts on consumer mortgage loan accounts for debtors in a Chapter 13 bankruptcy proceeding. Ocwen had further determined that it was systemically incapable of reconciling consumer escrow accounts for debtors in a Chapter 13 bankruptcy and that Ocwen employees were improperly debiting and crediting amounts into and out of consumer escrow

accounts in violation of the laws governing escrow accounts as well as Ocwen's obligations under bankruptcy law and under national mortgage servicing standards.

78.    On or about April 26, 2017, despite the Notice of Cure declaring Freeman current and requiring her to begin making direct monthly mortgage payments with the May 2017 installment, Ocwen rejected Freeman's attempt to make a payment and told Freeman her mortgage loan account was eight months delinquent. Ocwen later accepted the May 2017 payment.

79.    On or about December 19, 2017, despite making all payments due during her Chapter 13 case and all direct mortgage payments due after her plan completion and bankruptcy discharge, Freeman received a call from an Ocwen representative alleging Freeman was nine months delinquent on her mortgage payments.

80.    On or about February 8, 2018, despite making all payments due during her Chapter 13 case and all direct mortgage payments due after her plan completion and bankruptcy discharge, Freeman received another call from an Ocwen representative alleging Freeman was approximately $8,000.00 behind on her mortgage payments.

81.    In or about May of 2018, despite her never having missed or made an inadequate Payment during or following her Bankruptcy Case, and simultaneous with the dismissal of the First Foreclosure Case as described above, Ocwen stopped accepting Freeman's  payments on the Loan.

82.    On or about May 30, 2018, Freeman received a thirty-day pre-foreclosure notice letter by certified mail.

83.    But for Ocwen's refusal to accept her May payment, Freeman was contractually current on the Loan.

84. On July 5, 2018, Ocwen applied a $20.00 "Property Inspection (Exterior)" fee to Freeman's Mortgage without appropriate cause or necessity.

85. By information and belief, Ocwen continues to apply fees and expenses to Freeman's mortgage entirely without basis.

86. Ocwen continues to withhold insurance funds to which Freeman is legally entitled and desperately needs to repair her roof.

87. Ocwen continues to place default related correspondence upon the doorknob of Freeman's home.

88. By information and belief, Ocwen continues to direct third party servicers to Freeman's home to take pictures normally associated with an event of default.

89. Freeman continues to make timely and adequate payments to Ocwen.

**FACTUAL ALLEGATIONS RELATED TO OCWEN'S KNOWLEDGE OF SYSTEMIC PROBLEMS WITH REALSERVICING, ITS FAILURE TO CORRECT THE SAME, AND THE WIDESPREAD HARM TO DEBTORS RESULTING THEREFROM**

90. This Court can obtain indisputable proof of Ocwen's decades long, systemic, continuous, and unrelenting violation of the Bankruptcy Code and the discharge injunction by ordering Ocwen to produce to the Court documents Ocwen identifies as Risk Convergence Reports, ("RCRs").

91. The RCRs first came to light, to the best of Freeman's counsel's knowledge, when the CFPB sued Ocwen in April of 2017 for its ongoing failure to comply with applicable law in the servicing of consumer mortgage loan accounts.

92. Ocwen utilized the RCRs to track its own "regulatory violations, risk areas, and other failures" according to the CFPB's complaint.

93. The CFPB complaint described the RCRs as follows:

Since 2014, Ocwen has also tracked its regulatory violations, risk areas, and other failures in spreadsheets named "Risk Convergence Reports." Each regulatory violation, risk item, or failure identified in the report includes a description of the issue, the date Ocwen identified the issue, whether the issue is dependent on Altisource [the vendor who licensed RealServicing to Ocwen][2], the status of any technology fix or other operational remediation, and other information.

Each item in the Risk Convergence Reports is assigned a risk rating, ranging from "R1" to "R5." "R1" is the highest risk rating, which Ocwen defines as: "Potential adverse impact of over $5 million"; "Actual or high possibility for fraud, waste or abuse"; "Breach of company policy or procedures (frequent, repeat, or disregarding policy)"; "Noncompliance with the law or regulation"; or "Material errors or irregularities are a reasonable possibility."

According to Ocwen's list of items in the Risk Convergence Report, the items often resulted from and have continued due to REALServicing failures or system limitations. When, for example, Ocwen conducted its first on-site audit of Altisource and REALServicing in 2014, Ocwen auditors concluded that, although 70 percent of the items contained within the Risk Convergence Report related to "technology projects and enhancements" that Altisource was responsible for, little progress was being made to resolve the items due to Altisource's "lack of priority."

As of August 2015, Ocwen had catalogued 2,803 issues on its Risk Convergence Report. Of those 2,803 issues, Ocwen assigned the highest risk rating, "R1," to more than 550 issues, many of which resulted from REALServicing's deficiencies.

94.    Ocwen has never challenged as inaccurate the CFPB's description of the RCRs.

95.    The RCRs demonstrate that Ocwen has known for many years prior to the events in Freeman that RealServicing was systemically defective and those defects prevented Ocwen from complying with its legal obligations in relation to Chapter 13 bankruptcy proceedings.

96.    The RCRs are conclusive proof that the highest levels of Ocwen's management

---

[2] Inserted for context and clarity.

were fully aware of Ocwen's complete failure to comply with its legal obligations under the Bankruptcy Code. The RCRs also demonstrate that Ocwen allowed these problems to persist for years without remediation while knowing that these problems were inflicting substantial needless harm on consumers like Freeman who had completed a Chapter 13 bankruptcy proceeding and received a discharge. Ocwen knew these failings would cause Ocwen to violate the discharge injunction, misapply funds paid during and after the Chapter 13 case, and charge fees and expenses to which Ocwen lacked any legal right.

97.     Ocwen knew that its failure to remedy the longstanding problems with RealServicing that resulted in Ocwen's complete bungling of loan accounts in Chapter 13 bankruptcy would cause consumers to lose their homes or have their homeownership needlessly threatened by Ocwen's wrongdoing.

98.     Despite having this knowledge, Ocwen did nothing to prevent its lawlessness in Freeman's case or any other Chapter 13 debtor's case.

99.     From these facts, the Court can clearly infer that Ocwen's conduct is intentional, wanton or reckless. However, the RCRs are only one piece of a vast puzzle of wrongdoing established by years of regulatory actions against Ocwen for its disastrous mortgage servicing practices.

### OCWEN'S LONG HISTORY OF ABUSING CONSUMERS

100.    Ocwen's continued open flaunting of its legal obligations imposed by the Bankruptcy Code is in keeping with Ocwen's pattern of consumer abuse ongoing for more than a decade. This is especially true with respect to mishandling consumer's payments, and Ocwen's inability to comply with its legal obligations under the Bankruptcy Code and Rules.

### OCWEN'S 2011 AGREEMENT ON MORTGAGE SERVICING PRACTICES WITH THE NEW YORK DEPARTMENT OF FINANCIAL SERVICES

101.    On September 1, 2011, Ocwen entered into an agreement on mortgage servicing practices with the New York State Department of Financial Services ("NYDFS") regarding its mortgage servicing practices related to its acquisition of Litton Loan Servicing LP. ("the Agreement" or "Agreement"). The Agreement is attached as ***Exhibit A.***

102.    In this agreement, on page 1, NYDFS expresses its concerns regarding "unfair and improper practices in connection with loss mitigation, including improper denials of loan modifications."

103.    In the last paragraph of page 1 of this Agreement, Ocwen stated its "wish to be leaders in the mortgage servicing industry by adhering to, and causing to be adhered to, the Servicing Practices which they believe are in the best interest of homeowners and investors…[.]" In the "Now Therefore" paragraph of page 2, Ocwen agrees to abide by these mortgage servicing practices. Ocwen does not specify that it is implementing these practices as to only New York State loans. Rather, on page 1, in the fourth "whereas" paragraph, Ocwen agreed to adhere to these practices with all portfolios of loans.

104.    On page 2 of this Agreement, para. 2, Ocwen promised to ensure any information set forth in an affidavit or sworn statement detailing a borrower's default and the right to foreclose is accurate, complete, and reliable.

105.    On page 2 of this Agreement, para. 6, Ocwen promised to ensure its account information is accurate and complete and to promptly remediate any inaccuracies, as well as annually conduct an independent review of its systems, policies, and procedures to ensure that they are sufficient to ensure accuracy and completeness.

106.    On page 3 of this Agreement, para. 13, Ocwen promised to conduct regular audits of a statistically valid sample of documents from foreclosure and *bankruptcy* proceedings to

17

ensure the documents being filed complied with the loan instruments, prevailing law and "these Servicing Practices," its account information is accurate and complete and to promptly remediate any inaccuracies, as well as annually conduct an independent review of its systems, policies, and procedures to ensure that they are sufficient to ensure accuracy and completeness.

107.    On page 5 of this Agreement, para. 17, Ocwen pledged to provide compliance training for all employees and managers including training on applicable state and federal laws regarding mortgage servicing, loss mitigation, foreclosure proceedings, and Bankruptcy cases.

108.    On page 14 of this Agreement, paras. 44-46, Ocwen agreed to promptly accept and apply mortgage payments including payments made on cases in bankruptcy, including cure payments.

109.    This Agreement was subsequently amended by the parties on December 15, 2011 to include the statement that Ocwen would require compliance with this agreement as a condition of any agreement with any subservicer or third party to perform any servicing activities and that Ocwen would adhere to these practices for any loans acquired or added to its portfolio subsequent to the signing of the Agreement.

## 2012 Consent Decree With NYDFS

110.    On June 13, 2012, NYDFS conducted a targeted examination of Ocwen to assess its compliance with the Agreement. The examination resulted in the NYDFS finding that Ocwen was not in compliance with the Agreement including pursuing foreclosure against borrowers seeking a loan modification ("dual tracking") and failing to review loan modification denials, failing to implement policies and procedures to ensure that newly boarded accounts accurately reflect the borrower's account status and balance.

111.    The NYDFS believed the non-compliance warranted the appointment of an independent monitor to conduct a comprehensive review of these practices. Ocwen consented to the appointment of the monitor.

112.    On the 5th of December, 2012, Ocwen entered into a consent decree with NYDFS to resolve the concerns raised by the June 2012 targeted examination.

113.    This became the first consent decree between NYDFS and Ocwen over its mortgage servicing practices and will be referred to as the "2012 Consent Decree." This consent decree is attached as *Exhibit B.*

114.    The 2012 Consent Decree recited Ocwen's rapid growth over the preceding two years including the acquisition of other major mortgage servicers. This consent decree also recited Ocwen's history to that point with NYDFS including its prior Agreement and the investigation.

115.    The 2012 Consent Decree required Ocwen to select a Compliance Monitor who would report to NYDFS for a comprehensive review of Ocwen's servicing operations, including its compliance program and policies and procedures.

116.    Paragraph 2 and subparts of the 2012 Consent Decree set out the areas the compliance monitor would review.

117.    The 2012 Consent Decree also set out Ocwen's pledge to cooperate and set the length of the monitorship at twenty-four months.

118.    Ocwen ultimately selected the StoneTurn Group as its compliance monitor with the consent of NYDFS. StoneTurn ultimately produced less than ten Monitor Compliance Review Reports ("MCRs") which set out in spectacular fashion Ocwen's extensive failings with

respect to the 2011 Agreement. These Reports became the impetus for Ocwen's 2014 Consent Decree with NYDFS.

## Ocwen's 2014 Consent Decree with NYDFS

119.     Ocwen entered into a second consent decree with NYDFS on December 19, 2014 (the "2014 Decree").

120.     The 2014 Decree arose from the findings of the Compliance Monitor and the NYDFS regarding Ocwen's mortgage servicing practices.

121.     By the time of this 2014 Consent Decree, Ocwen had grown more than ten-fold since 2009 and the number of loans Ocwen was servicing had increased from 351,595 to 2,861,918. Ocwen had become the fourth largest mortgage servicer and the largest servicer of subprime loans in the United States.

122.     The Compliance Monitor began its work in July of 2013 and identified numerous and significant violations of the 2011 Agreement. This included a small sampling of almost 500 New York loans where Ocwen averaged three violations of its legal obligations per file. This included foreclosing on borrowers who were seeking loan modifications ("dual tracking"). In addition, the Monitor and NYDFS identified inadequate and ineffective information technology systems and personnel.

123.     The Monitor determined that Ocwen's IT systems were a patchwork of legacy systems and inherited systems and many of them were incompatible. The Monitor noted that frequently fixing one system created unintended consequences in other systems. The Monitor found this caused Ocwen to give borrowers outdated and incorrect information, send backdated letters, and maintain inadequate records. The Monitor noted that Ocwen had insufficient controls in place, either manual or automated, to catch and resolve all of these errors.

124.    The Monitor noted that Ocwen systems had backdated letters for years and in many cases, borrowers received time sensitive correspondence long after the time for the borrower to act had passed. Ocwen's systems and processes failed to remedy these errors.

125.    The Monitor found that Ocwen failed to fully investigate or address the issue and had not completed its investigation or resolved the issue more than a year after its discovery.

126.    The Monitor and NYDFS found that Ocwen's core servicing functions rely on its inadequate systems. This includes more than 8,400 comment codes including more than 50 for the sole function of assigning a single point of contact.

127.    In contrast to Ocwen's platform, the most frequently utilized mortgage servicing platform has less than 100 comment codes for all of its functions. In addition, Ocwen had no code description catalog or dictionary to explain the meaning of each code, when the code should be used, and what action the code triggered in the system.

128.    The Monitor and NYDFS found that Ocwen's inadequate infrastructure and ineffective personnel resulted in Ocwen's failure to fulfill its legal obligations and that prior to the NYDFS and Monitor's compliance review Ocwen did not take adequate steps to implement reforms that it was legally obligated to implement under the 2011 Agreement.

129.    As a result of its findings, NYDFS assessed Ocwen a monetary payment of $150 million dollars including a $100 million dollar civil penalty and $50 million as restitution to New York borrowers.

130.    NYDFS also required Ocwen to hire an independent Operations Monitor review and assess the adequacy and effectiveness of Ocwen's operations for a period of twenty-four months.

131.    NYDFS also required Ocwen's CEO, William Erbey, to resign from his positions with Ocwen and have no directorial, management, oversight or consulting role with Ocwen or its affiliates.

132.    In addition to its compliance issues with NYDFS, Ocwen was also subject to other regulatory action relating to its mortgage servicing practices.

### The 2014 National Mortgage Servicing Settlement and Settlement Agreement and Consent Order with 49 States

133.    In December of 2013, Ocwen executed a Settlement Agreement and Consent Order with 49 States and their regulators regarding Ocwen's servicing practices. This document was interrelated with the February 2014 consent judgment between Ocwen and the CFPB. This Document is attached as *Exhibit C* and is hereafter referred to as the "State Settlement Agreement" or "SSA."

134.    The SSA's findings included at page 6, paragraph c, that Ocwen had a lack of controls related to general borrower account management, including but not limited to: (1) Misapplication of borrower payments; (2) Inaccurate escrow accounting and statements; and (3) Assessment of unauthorized fees and charges.

135.    Also, in paragraph g, at page 7, the findings included "[d]eficiencies in management control and supervision necessary to ensure compliance with applicable laws and regulations." The SSA required Ocwen to comply with the mortgage servicing standards set out in Exhibit A to the February of 2014 consent judgment with the CFPB.

136.    In February of 2014, Ocwen entered into a consent judgment with the United States and 49 States regarding its mortgage servicing practices, a copy of which is attached as *Exhibit D*.

137.    As part of this consent judgment, Ocwen agreed to adhere to certain mortgage servicing standards as set out therein and pay $127.3 million dollars in restitution for borrowers whose homes were sold between January 1, 2009 and December 31, 2012 as well provide $2 billion dollars in principal reductions for eligible consumers. The consent judgment also appointed a Monitor for Ocwen's operations.

138.    Exhibit A to this consent judgment contains what is commonly referred to as the National Mortgage Servicing Standards and they have become standard for all mortgage servicers.

139.    Including within these standards, Ocwen agreed to ensure that all factual assertions made in pleadings, including documents filed in bankruptcy courts, are accurate and complete and supported by competent and *reliable* evidence. *See* A-1, ¶ 1. Ocwen also agreed not to file a POC in any bankruptcy case containing materially inaccurate information. *See* A-3, ¶ 15.

140.    Ocwen agreed to maintain accurate information regarding the borrower's account and promptly apply payments. *See* A-4,5.

141.    Ocwen agreed to adopt enhanced billing dispute procedures, including disputes regarding fees. The procedures were required to include readily available methods to lodge complaints and pose questions, providing adequate and competent staff to answer and respond to disputes, and establishing a process for dispute escalation. *See* A-6.

142.    Ocwen also agreed to promptly remediate any inaccuracies in borrower's account information and audit its account information periodically for accuracy. *See* A-7

143.    In active Chapter 13 cases, Ocwen agreed to ensure that prompt and proper application of payments were made on account of pre-petition arrearage amounts and post-

petition payment amounts and posting thereof; the debtor was to be treated as current so long as the debtor is performing under the plan; and to perform a reconciliation of payments received upon entry of an order granting relief from stay, a dismissal of the case or entry of an order of discharge and to properly update Ocwen's records including waiving any fee, expense or charge tracked during a plan upon a discharge. *See* A-8.

144.    Ocwen agreed to only submit accurate POCs that included required supporting documentation and a proper calculation and breakdown of all amounts due. *See* A-9, 10.

145.    At page A-15, 16, Ocwen agreed to ensure that all employees regularly involved with bankruptcy files receive specific training on bankruptcy issues; to always file an Official Form B10 within 180 days after any fees, expenses or charges are incurred and to timely response to notices of final cure under Rule 3002.1.

146.    Ocwen also agreed to electronically document key actions taken on bankruptcy files including all communications with borrowers. *See* A-30.

### RealServicing: Ocwen's Failed Mortgage Servicing System

147.    Despite Ocwen's Agreement and multiple consent decrees with NYDFS, as well as its consent judgment with the United States and 49 States regarding its ongoing mortgage servicing practices, Ocwen still failed spectacularly to comply with its legal obligations to properly service mortgage loan accounts.

148.    The primary reason for this failure was Ocwen's reliance upon its proprietary mortgage servicing platform that Ocwen referred to as RealServicing.

149.    It was this information technology system that NYDFS and the Compliance Monitor found to be "inadequate and ineffective," a patchwork of incompatible legacy systems and inherited systems, incapable of being fixed, that caused Ocwen to give borrowers outdated

and incorrect information, send backdated letters, and maintain inadequate records, and lacked sufficient controls, either manual or automated, to catch and resolve all of these errors.

150.     Despite notice and knowledge of the systemic problems with RealServicing, Ocwen continued to use RealServicing until June of 2019. Freeman, like millions of other Ocwen customers, was injured and has lived under threat of losing her home for years because Ocwen employed this broken system, with ineffective personnel, in violation of its legal obligations under numerous consent decrees and judgments, as well as state and federal law.

151.     Ocwen's knowledge of the scope and severity of the problems with RealServicing were known by the highest levels of Ocwen's management, long before Freeman was needlessly injured and harmed. We know this because of further regulatory action taken against Ocwen beginning in 2017.

**The CFPB Lawsuit against Ocwen in April of 2017**

152.     In April of 2017, the CFPB filed a 93-page complaint against Ocwen in the Southern District of Florida. This lawsuit generally alleged that Ocwen continued to engage in the misconduct that gave rise to the 2014 National consent judgment between Ocwen and 49 States, and, as a result, millions of additional consumers were needlessly harmed by Ocwen.

153.     The CFPB stated in its complaint that as of December 31, 2016, Ocwen serviced 1,393,766 loans with an aggregate unpaid balance of approximately $209 billion and these loans were located in all fifty states and the District of Columbia.

154.     The CFPB described Ocwen's RealServicing system of record in great detail, noting that Ocwen had spun off its internal technology department into a company called Altisource who now owned and maintained RealServicing, and that no other mortgage servicer used RealServicing.

155.    The CFPB alleged that RealServicing was so broken that even when accurate information is input the system would generate inaccurate information due to the system's deficiencies. The CFPB alleged that the use of RealServicing caused Ocwen to use inaccurate and incomplete information for all important aspects of mortgage servicing from payment application to loss mitigation and foreclosure management.

156.    Normally, the allegations of another complaint would have little probative value in a separate proceeding beyond notice and knowledge of a regulator's concerns.

157.    However, the CFPB based its complaint, in substantive part, on the contents of the RCRs.

158.    The CFPB noted that items in the RCRs often resulted from and have continued due to RealServicing's failures or limitations.

159.    The RCRs in August 2015 showed 2,803 issues and more than 550 were rated as R1 or highest rating.

160.    In fact, after reviewing the RCRs in other litigation in the Southern District of Indiana, it appears from their contents that Ocwen entered into many of these consent decrees and judgments knowing full well that Ocwen could not comply with the terms of the consent decrees and judgments because of RealServicing's wholesale failings as a mortgage servicing platform. This includes an institutional inability to fulfill Ocwen's obligations under the Bankruptcy Code and for the proper application and reconciliation of payments made and received by consumers in a Chapter 13 Bankruptcy.

161.    Freeman urges the Court to allow her to inquire of Ocwen's executives about their knowing entry into these regulatory agreements with the knowledge that Ocwen could not comply with the agreements made with multiple state and federal regulators.

26

162. The CFPB also based many of its allegations on internal emails and reports between high ranking Ocwen executives.

163. For instance, in 2014, Ocwen's Head of Servicing messaged Ocwen's CEO that RealServicing was "an absolute train wreck. I know there's no shot in hell, but if I could change systems tomorrow I would."

164. In May of 2016, Ocwen's former head of Servicing Compliance testified she was absolutely concerned that Ocwen could not service loans on RealServicing in compliance with applicable laws during 2014 and 2015. She testified that the root cause of various problems was almost always RealServicing.

165. Also in 2016, Ocwen's Chief Information Officer and other personnel performed an architectural assessment of RealServicing and found the most important dimensions of its core technology compared unfavorably with other mortgage servicing platforms.

166. The CFPB alleged that RealServicing used too many codes and that without definitional data errors were inevitable, lacked the necessary automation and functionality to handle basic servicing operations, lacked the capacity to process the number of loans Ocwen was servicing, and was plagued by bugs, defects and failures that negatively impacted Ocwen's ability to service mortgage loan accounts.

167. The CFPB noted that all of these problems led Ocwen to rely on manual workarounds that led to further problems with the accuracy of its data and its data entry. A former Head of Servicing Compliance testified that "every business unit in the entire organization" lacked sufficient controls to prevent mistakes and detect mistakes when they occurred.

168.    For instance, in 2015, Ocwen's own executives identified the loan modification process as having an 80% error rate and a lack of synchronicity between RealServicing and its foreclosure processing application. In addition, the CFPB alleged that Ocwen's errors caused Ocwen to communicate inaccurate and incomplete information regarding both loss mitigation and foreclosure to consumers.

169.    The CFPB also alleged that RealServicing's failures caused Ocwen to mishandle borrower's payments, including failing to accurately credit payments and failing to correct billing and payment errors. These errors have led Ocwen to assess improper fees, report inaccurate payment information to credit reporting agencies, place accounts into collections and improperly foreclose on borrowers' homes.

### Contemporaneous 2017 Regulatory Action by Several States

170.    On the same day that Ocwen was sued by the CFPB in the Southern District of Florida, more than 20 States issued cease and desist orders to Ocwen related to its mortgage servicing practices.

171.    The cease and desist orders had their genesis in a February 28, 2015, Multi-State Examination of Ocwen to determine its compliance with applicable state and federal laws and regulations, financial condition, and control and supervision of its mortgage servicing operations.

172.    The Examination revealed several violations of state and federal law, Ocwen's management's failure to respond to requests for information, unlicensed servicing activities, and inability to accurately reconcile many of the escrow accounts in its portfolio.

173.    Ocwen had refused to address the issues the States had identified, and Ocwen had engaged in, is engaging in, or is about to engage in acts or practices warranting the belief that the

company is not operating honestly, fairly, soundly, or efficiently and violating mortgage loan servicer standards.

174.    The States uniformly ordered Ocwen to cease acquiring new mortgage servicing rights in their respective States until Ocwen could correct its issues.

175.    In its cease and desist order, the State of Massachusetts found that Ocwen failed to identify, measure, monitor, and control risk associated with its rapid growth. RealServicing had well documented and extensive problems. Ocwen lacked the internal controls necessary to ensure that consumers received accurate loss mitigation information. Ocwen engaged in a pattern and practice of failing to timely reconcile consumer custodial accounts. This resulted in a finding that Ocwen's internal controls are insufficient to meet its loan servicing duties under state and federal laws; enforcement orders; and consent decrees. Based on these issues, Ocwen was not operating in a safe and sound manner. Lastly, Ocwen failed to cooperate with the MMC Examination.

176.    The State of Massachusetts found that "Ocwen failed to demonstrate the financial responsibility, character, reputation, integrity, and general fitness that would warrant the belief that the business will be operated honestly, fairly, and soundly in the public interest … [.]" As a result, Massachusetts ordered Ocwen to transfer its entire portfolio of mortgage loans in Massachusetts to one or more appropriately licensed and State approved mortgage servicers within 120 days of the Order.

### Accumulated Evidence of Extensive Internal and External Notice and Knowledge of Severe Shortcomings with RealServicing and Mortgage Servicing Practices

177.    From all the regulatory actions that occurred from 2011 to April of 2017, Ocwen's most senior management was aware that the CFPB and 49 States had expressed their

earnest belief that Ocwen's mortgage servicing practices were sorely deficient. That Ocwen's system of record was incapable of functioning at a level required to properly, accurately and legally service mortgage loans, and that consumers were suffering substantial needless harm as a result of these failures.

178.    As a result of the regulatory actions during this time frame, Ocwen had agreed to pay hundreds of millions of dollars in fines and penalties, provide billions of dollars in consumer relief through debt forgiveness and reduction, its CEO had been forced out by a regulator, Ocwen had agreed to reform its servicing practices nationally, Ocwen's ability to grow its portfolio of mortgage servicing rights had been restricted and Ocwen had been forced to cease servicing mortgage loans in at least one State, while being sued for the second time by the CFPB over its failings as a mortgage servicer.

179.    From its own internal investigations and reports, Ocwen's most senior management was aware that RealServicing was a train wreck. Ocwen had self-identified more than 550 issues that Ocwen believed exposed it to more than $5 million dollars in liability. Ocwen had self-identified defects in the accuracy of its core consumer account data, failings in its obligations to properly credit payments, a systemic bungling of its loss mitigation obligations, thousands of foreclosures where loss mitigation was in process, and a company-wide inability to comply with its obligations under the Bankruptcy Code, all these defects and issues were in violation of law.

180.    Despite this cornucopia of consumer abuses, Ocwen continued to use RealServicing with all these known and admitted defects, throughout the relevant time period that resulted in the bungling of Freeman's Chapter 13 case.

**Ocwen's Ongoing Pattern of Abusing Consumers**

181. In June of 2019, Ocwen finally transferred its loan servicing portfolio from RealServicing to a different mortgage servicing platform owned and licensed by Black Knight, formerly Lender Processing Services. The platform is usually referred to as MSP and is the most commonly and widely used servicing platform in the industry.

182. Along with the transfer of data to MSP, Ocwen also began doing business as PHH Mortgage.

183. Ocwen went so far as to send a notice of servicing transfer to its consumer accounts to make it appear that Ocwen and PHH are two different mortgage servicers rather than a successor by merger.

184. However, this transfer of servicing onto MSP by no means solved Ocwen's data integrity problem. This is because of the basic programming and data entry principle of "GIGO," or "garbage in, garbage out."

185. When a mortgage servicer transfers servicing from itself or its system of record to another servicer or system of record, the only check for the accuracy of the data is to ensure that the data point in the old system matches the data point in the new system.

186. There is no audit of the actual accuracy of the data point.

187. Therefore, every inaccurate data point based on the failings of RealServicing, were transferred, *en masse*, to the MSP system.

188. To make matters worse, Ocwen and Altisource then fully decommissioned RealServicing and have testified that RealServicing has ceased to exist as a database.

189. Therefore, when a consumer is confronted with inaccuracies in the data in MSP, and raises that issue with Ocwen, now presenting itself as PHH Mortgage, Ocwen responds with "well, that data point is what we got from the prior servicer." Ocwen then uses this justification

to avoid making any further corrections to the consumer's account and to justify and obscure its continued misconduct.

190.    The consumer cannot go back to Ocwen and RealServicing because Ocwen and RealServicing allegedly no longer exist. Ocwen also uses this self-serving, diabolical scheme to avoid its discovery obligations where servicing between RealServicing and MSP overlap, such as a case like Freeman.

191.    When one contrasts this scheme with Ocwen's inept and deficient servicing history spanning more than a decade, it becomes even more apparent that Ocwen's conduct is intentional, in bad faith, and designed to cover up extensive wrongdoing.

192.    In every other situation where Ocwen inherited a legacy system from an acquired mortgage servicer, going back more than a decade, Ocwen always and without fail, maintained that legacy system so that it could be queried and referred to in the event of any questions regarding the prior servicing data. Only in the case of RealServicing, the most notoriously defective mortgage servicing platform in history, a system plagued with systemic inaccuracies and flaws, did Ocwen decommission the platform.

193.    Ocwen's conduct in this case is in keeping with its pattern of ignoring its legal obligations and inflicting substantial needless harm on consumers who are defenseless to its predations.

194.    In this instance, Ocwen ignored its obligations under the Bankruptcy Code, ignored its obligations to properly service Freeman's loan set out in various regulatory consent decrees and judgments, failed to properly accept and apply payments to pre-petition and post-petition amounts due, failed to comply with Rule 3002.1, failed to properly reconcile Freeman's account post-discharge, and failed to honor this Court's discharge injunction.

195.    Ocwen's intentional and knowing conduct inflicted massive needless harm on Freeman, denied Freeman the benefit of the promised fresh start, and caused massive non-economic damages in the form of stress, anxiety, fear of losing her home, worry, sleeplessness, and an attack upon her quiet enjoyment of life and home.

196.    Ocwen's conduct adversely affected Freeman and has adversely affected millions of consumers nationally and thousands in the State of Indiana.

197.    Ocwen has intentionally, knowingly, or recklessly inflicted needless harm on all of these consumers.

198.    Ocwen should face the most severe punishment the law will allow.

**COUNT I: Violation of the Discharge Injunction (11 U.S.C. § 524)**

199.    Freeman incorporates by reference and restates as though fully set forth herein all previous allegations.

200.    On April 24, 2017, Ocwen filed a *Response to the Notice of Final Cure Payment*.

201.    The contents of Ocwen's *Response to the Notice of Final Cure Payment* and entry of the *Order of Discharge* on November 21, 2017, caused Freeman to be contractually current pursuant to 11 U.S.C. § 524, Federal Rule of Bankruptcy Procedure 3002.1 and the language of her *Chapter 13 Plan*.

202.    Ocwen is now seeking to collect amounts from Freeman which were either paid through her confirmed Chapter 13 plan or discharged pursuant to the Court's entry of the discharge injunction in Freeman's bankruptcy case.

203.    Ocwen's actions are willful, knowing, and reckless and are an ongoing attempt to collect a discharged debt and otherwise frustrate the purpose of the Order of Discharge.

204.    Ocwen's conduct constitutes a gross violation of the discharge injunction as it had actual knowledge that: (1) the REALServicing platform and its lack of sufficient processes systematically treated borrowers who had successfully completed a Chapter 13 bankruptcy proceeding as in default; (2)  Freeman was previously involved in bankruptcy, was to be deemed contractually current, that certain fees were disallowed, and thereafter protected from any direct or indirect collection actions for discharged debts; and, (3) that by continuing to utilize REALServicing it would cause widespread harm, both physical and emotional, to consumers and debtors, including without limitation Freeman.

205.    Ocwen's actions were willful, knowing, reckless, or intentional and caused Freeman concrete injury as set forth above, rendering Ocwen liable for punitive damages. *See, e.g.*, *Romanucci & Blandin, LLC. v. Lempesis*, 2017 WL 4402643, at *6-7 (N.D. Ill. May 4, 2017); *see also,* 3 *William L. Norton Jr. & William L. Norton III*, NORTON BANKRUPTCY LAW AND PRACTICE § 58:2 (3d ed. 2017) ("A majority of courts also allow punitive damages in appropriate cases for a violation of the discharge injunction although, unlike the statue governing violations of the automatic stay, punitive damages are not specifically mentioned in Code § 524.6.").

206.    Freeman alleges that in order to carry out this provision of the Bankruptcy Code and maintain its integrity, vital to the protection of Chapter 13 debtors who have paid as required, this Court must punish Ocwen for its outrageous misconduct with respect to Freeman's case. In assessing a proper punishment, the Court must contemplate the length of Ocwen's contemptuous behavior, the knowing and intentional nature of this conduct, Ocwen's unwillingness to remedy known systemic defects in its mortgage servicing platform, and the length of time this lawless conduct has been ongoing, Ocwen's contempt for its own legal

obligations, Ocwen's contempt for consumers who are protected by the discharge injunction, and Ocwen's contempt for this Court's rulings and authority.

### COUNT II:    Violations of the RESPA

207.    Freeman incorporates by reference and restates as though fully set forth herein all previous allegations of this Complaint.

208.    Within 45 days of the conclusion of the Bankruptcy Case, Ocwen began making weekly collection calls inquiring about how she intended to cure the "default" status of her mortgage.

209.    During many of the aforementioned calls, Freeman notified the Ocwen representative, or their supervisor, that she was current, had made adequate and timely monthly payments as required, and that any alleged delinquency was an error.

210.    Ocwen's calls, and Freeman's attempts to notify Ocwen of their error in treating her as if she was in default, continued until sometime in late May of 2018.

211.    Recognizing that Ocwen had made an egregious error with respect to the servicing of her Loan, fearing foreclosure, and unable to resolve the issue by paying amounts she knew to be correct or by means of her conversations with Ocwen's representatives, Freeman directed numerous correspondence to notify it of its ongoing errors.

212.    On October 7, 2019, Freeman directed correspondence captioned "Notice of Errors under 12 C.F.R. §1024.35(b)(11)" ("NOE No. 5"), and dated, for: (i) noticing her of its intent to foreclose [again] without basis, a defined error as set forth in 12 C.F.R. § 1024.35(b)(9) and (11); (ii) failing to promptly credit payments as required y 1026.36(c) of Reg. Z and 12 C.F.R. 1024.35(b)(11); and, (iii) failing to appropriately apply payments, a defined error as set forth in 12 C.F.R. §1024.35(b)(2).

213. NOE No. 5 also requested Ocwen provide all documents it relied upon if it were to determine no error had occurred, per Reg. X, 12 C.F.R. §§ 1024.35(e)(1).

214. A true and accurate copy of NOE No. 5 is attached hereto as ***Exhibit E***.

215. By and through NOE No. 5, and her other communications with Ocwen representatives, Freeman brought the aforementioned errors to Ocwen's attention, made them aware of the ongoing problems with the Loan, and requested that the errors be investigated and corrected.

216. Ocwen received NOE No. 4 shortly thereafter via counsel and US Mail.

217. Ocwen took no action to reasonably investigate or correct the distinct errors identified in NOE No. 5.

218. If Ocwen had conducted a reasonable investigation it would have determined that it had been and continued to hold the Loan in a manufactured state of default and inappropriately hand her mortgage payments.

219. The errors identified in NOE No. 5 remain uncorrected.

220. Ocwen has and continues to conceal the source, nature, and extent of the mishandling of the Loan while making material misrepresentations to Freeman designed to give the appearance the errors associated with the servicing of her Loan were being investigated or would be addressed.

221. Those fraudulent concealment efforts include Ocwen's merger by acquisition of PHH, designed to give the appearance Ocwen had resolved its inability to properly service loans generally; its misrepresentations to the effect the items specifically identified in NOE No. 5 could even be fixed following the transfer of the Loan from REALServicing to BlackKnight; and that the issues were being investigated.

36

222.    Freeman relied on the misrepresentations of Ocwen in not filing suit sooner.

223.    Any reasonable investigation into the errors alleged by NOE No. 5, even without the benefit of additional communications from Freeman, would have uncovered the errors alleged and resulted in some action being taken to address them.

224.    NOE No. 5 met the requirements of a notice of error as defined by 12 C.F.R. § 1024.35(a).

225.    As described above, Ocwen's actions constitute a pattern and practice of servicing misconduct in conscious disregard for consumers such as Freeman.

226.    Freeman hereby requests and demands a trial by jury with respect to Count II.

## PRAYER FOR RELIEF & JURY DEMAND

**WHEREFORE**, Freeman, having set forth her claim for relief and the facts supporting this claim, respectfully prays of this Honorable Court as follows:

A.    That this Court adjudge Ocwen to be in Contempt of this Court's discharge injunction;

B.    That Freeman have and recover against Ocwen a sum to be determined by the Court in the form of actual damages;

C.    That Freeman have and recover against Ocwen a sum to be determined by the Court in the form of punitive damages in such an amount that will impress upon Ocwen the seriousness of its wrongdoing and fraudulent misrepresentations;

D.    That Freeman have and recover the costs of this litigation including attorney's fees and costs; and

E.    That Freeman have such other and further relief as the Court may deem just and proper.

*Respectfully submitted,*

/s/ *Travis W. Cohron*
Travis W. Cohron, No. 29562-30
Oliva A. Hess, No. 36166-49
CLARK, QUINN, MOSES, SCOTT & GRAHN, LLP
320 N. Meridian Street, Suite 1100
Indianapolis, IN 46204
Telephone: (317) 637-1321
tcohron@clarkquinnlaw.com
ohess@clarkquinnlaw.com
**Counsel for the Plaintiff**