UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
Indianapolis Division

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **DEMONA FREEMAN**, | ) | |
| | ) | Case No. 12-04713-JJG-13 |
| *Debtor*. | ) | |
| | ) | |

_____

| | | |
|---|---|---|
| | ) | |
| **DEMONA FREEMAN**, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Adversary No. 21-50006 |
| | ) | |
| **PHH MORTGAGE CORPORATION** | ) | |
| **f/k/a OCWEN LOAN SERVICING, LLC.**, and | ) | |
| **OCWEN FINANCIALCORPORATION**, | ) | |
| | ) | |
| *Defendants*. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
MOTION FOR PROTECTIVE ORDER [Doc. 21]**

Plaintiff Demona Freeman ("Freeman") submits this *Response In Opposition to Motion for Protective Order* filed by Defendant PHH Mortgage Corporation as successor in interest to Ocwen Loan Servicing, LLC (hereinafter "Ocwen") In support, Freeman states the following:

**I.   Introduction**

At the outset, Freeman asks the Court to take judicial notice of the docket in the District Court case this matter was severed from found at case number 1:18-cv-3844-TWP-DLP. From that judicial notice, the Court will be informed of the depth and scope of the *Stalingrad* defense interposed in this matter by Ocwen. This motion is but a continuance of the same untoward conduct

1

by a corporate defendant unwilling to engage in basic discovery without litigating every issue to the hilt.

## II.    Background

Ocwen has represented one set of facts in its motion that is far removed from the actual dealings of the Parties on this matter. The primary disconnect involves Ocwen's claim that it waited until the last minute to move for protective order due to some act of Freeman. The reality is that Ocwen's late filing was part of ongoing purposefully dilatory tactics in furtherance of its scorched earth defense of Freeman's claims. Ocwen stated in motion to this Court that it delayed filing its motion for protective order until July 1, 2022, due to its concern that Plaintiff's topics would change.

Nothing could be further from the truth. Rather, Ocwen has had the list of final 30(b)(6) topics, including those topics Ocwen intended to seek a Protective Order to address, since April 15, 2022. Ocwen's choice to file its objections and motion for protective order on July 1, 2022 was a deliberate attempt to create a litigation advantage whereby Ocwen could bifurcate the 30(b)(6) testimony and have an opportunity to prepare a witness for lines of inquiry after hearing questions and entering objections to them and having its counsel observe the documents and lines of questioning asked so that Ocwen could better contrive answers to proper inquiries.

Freeman dealt with these exact same tactics from Ocwen in the district court case. In the District Court, Freeman engaged in a lengthy meet and confer with Ocwen only to have Ocwen file last minute objections to many of the topics in the 30(b)(6) notice. Ocwen's counsel then used the late-filed objections as grounds to interfere with the examination of Ocwen using speaking objections and vague references to its late-filed objections to interrupt Ocwen's testimony or avoid testimony on what Ocwen perceived as damaging areas of inquiry. This interference effectively

2

created a bifurcation of the 30(b)(6) examination in the District Court case and created unnecessary motion practice that has thwarted completion of discovery in the District Court case.

### A. Freeman's Efforts to Avoid this Exact Situation

Freeman sought to avoid a repeat of these same tactics by Ocwen in the bankruptcy adversary proceeding. To that end, Freeman's counsel engaged in multiple meet and confer conferences and phone calls to specifically negotiate all topics of the Rule 30(b)(6) notice with counsel for Ocwen as fulsomely as possible by April 15, 2022. At the end of that effort, the only topics left in dispute were those the Parties agreed would require the Court's involvement. See **Exhibit 1** hereto, email from Wooten to Nichols on April 15, 2022 at 11:59 a.m.

Later that same day, Freeman's counsel confirmed Ocwen's counsel agreed to move for a protective order "as quickly as possible" in the hopes the disputed topics could be ruled upon by the Court before the rescheduled 30(b)(6) deposition. See **Exhibit 2** hereto, Email from Wooten to Nichols on April 15, 2022 at 1:37 p.m. Again on April 19, 2022, Freeman's counsel provided a clean copy of the 30(b)(6) notice to Ocwen's counsel and again noted Freeman's expectation that Ocwen would pursue its motion for protective order at that time. See **Exhibit 3**, Wooten email to Nichols on April 19, 2022 at 1:11 pm.

Despite Freeman's counsel having multiple conversations and multiple meet and confers intended to frame any disagreements with Ocwen for the Court's resolution long before the actual taking of testimony, Ocwen failed to seek a protective order after receiving this final version of the 30(b)(6). At the time this document was delivered to Ocwen, the 30(b)(6) deposition was scheduled for May 12, 2022.

In May, the parties agreed to continue the 30(b)(6) deposition to attend a settlement conference and rescheduled the 30(b)(6) until July 1, 2022. The settlement conference confirmed

3

there was no chance this matter would settle. Freeman's counsel called Ocwen's counsel to ***again*** request that Ocwen file its motion for protective order on the disputed topics. Ocwen's counsel then wrote to Freeman's counsel its motion for protective order would be filed "by early next week" on June 9, 2022. See **Exhibit 4**, Nichols email to Wooten on June 9, 2022 at 2:13 p.m.

Again, Ocwen failed to file anything in this case. Instead, Ocwen preferred to wait until the evening before its scheduled July 1, deposition and file objections to the disputed topics at 9:30 p.m. The next morning, Freeman's counsel confirmed that if the deposition went forward, Ocwen would again engage in the same tactics Ocwen had previously used in the District Court case to thwart its examination. Rather than proceed with the deposition on July 1, 2022 knowing that Ocwen's counsel's conduct would necessitate a bifurcation of the testimony and interfere with the orderly examination of Ocwen, Freeman's counsel continued the 30(b)(6) deposition until this motion could be resolved.

Ocwen July 1, 2022 filing attempts to justify its dilatory tactics by alleging a concern topics would change. Ocwen seized upon the inadvertent (and immediately corrected) attachment of a prior version of the 30(b)(6) notice Ocwen had in its possession since April 15, 2022. Ocwen's counsel has tried to claim that its dilatory filing here was justified because it was conditioned upon receiving an amended notice of deposition. See FN 2, pg. 3 of Doc. 22. This is a canard. The "amended notice" only addressed the date and time of the deposition. There has been no change to any 30(b)(6) topic since the parties concluded their meet and confer on April 15, 2022, and agreed the topics in the notice would be those utilized for this deposition.

### III.    Legal Standard

This Court has the power to issue a protective order only upon a showing of "good cause" to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.

4

Fed. R. Civ. P. 26(c)(1); *see also Jepson, Inc. v. Makita Electric Works, Ltd.*, 30 F.3d 854, 858 (7th Cir. 1994). "To establish good cause, a party must submit 'a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements.'" *Felling v. Knight*, 211 F.R.D. 552, 554 (S.D. Ind. 2003) (quoting *Wilson v. Olathe Bank*, 184 F.R.D. 395, 397 (D. Kan. 19999)). "Good cause is established by showing that the [discovery] will cause a clearly defined and serious injury." *Hobley v. Chicago Police Commander Burge*, 225 F.R.D. 221, 224 (N.D. Ill. 2004) (citing *Felling v. Knight*, 2001 WL 1782360, at *2 (S.D. Ind. Dec. 21, 2001)).

The burden of establishing good cause for a protective order rests upon the party seeking it. *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 n.16 (1981); *Hodgdon v. Northwestern Univ.*, 245 F.R.D. 337, 341 (N.D. Ill. 2007) ("[Rule 26] puts the burden on the party seeking the protective order to show some plainly adequate reason for its issuance."). Before restricting discovery, a court should consider "the totality of the circumstances, weighing the value of the material sought against the burden of providing it," and taking into account society's interest in furthering "the truthseeking function" in the particular case before the court. *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 681 (7th Cir. 2002).[1]

### IV.     Argument

**A.     Plaintiff should be barred from obtaining irrelevant testimony and / or limited in the scope of the testimony she can seek.**

1. <u>Many of Plaintiff's deposition topics are not limited to the relevant time period in this matter based on the claims at issue</u>.

---

[1] This function is of particular import given there are now two other matters before this Court entailing nearly identical allegations of misconduct against Ocwen: *Demona Freeman v. Ocwen Loan Servicing, LLC.*, Cause No. 1:18-cv-03844-TWP-DLP, and *Roderick Converse v. Ocwen Loan Servicing, LLC.*, Cause No. 1:19-cv-04872-SEB-MPB.

The propositions offered by the headings in Ocwen's argument could be classified as "blinding flashes of the obvious." Freeman does not seek out of scope testimony. Ocwen simply doesn't understand Chapter 13 bankruptcy. That much is clearly evident both by its treatment of Freeman and its arguments about scope and relevance. Freeman filed her Chapter 13 bankruptcy case on April 23, 2012. Ocwen's handling of Freeman's bankruptcy case is at issue in this matter. It is because Ocwen mishandled Freeman's case during and after her bankruptcy that Ocwen has violated the discharge injunction in this case. The bungling of the Chapter 13 case by Ocwen is intertwined with its faulty bankruptcy audit post-discharge that led to the discharge injunction violation. That is why Freeman has sought discovery on some topics that are dated back to 2012.

As to topics 8 & 9, Freeman seeks the identity of the day-to-day manager of Ocwen's bankruptcy department for the time period from when Freeman filed her petition (2012) until Ocwen ultimately declared in February 2019 that Ocwen had "fixed" Freeman's mortgage loan account. "It is beyond doubt that it is the creditor's obligation to remedy any discharge violation." *In re Southworth*, 2021 WL 1422871, at *2 (Bankr. N.D.N.Y. Jan. 22, 2021).

What the Court will learn at trial is that Ocwen's systems and processes repeatedly failed Freeman from the filing of her Chapter 13 case to the present day. This failure culminated in February of 2019 when Mr. Cohron' s prelitigation efforts caused Ocwen to realize it was attempting to collect discharged debt and had wrongfully filed foreclosure. There was a six-month period where Ocwen would not accept Freeman's payments due to its discharge violation. When Ocwen "corrected" Freeman's account, Ocwen never reset Freeman's account to current, rather, Ocwen then claimed that Freeman was six months behind. This six-month period was when Ocwen had wrongfully accelerated Freeman's payments and filed foreclosure in violation of the discharge injunction. Rather than bringing Freeman back to current and letting her continue to make her

6

payments, Ocwen maintained that the failure to pay during the six months Ocwen had wrongly accelerated the debt was a new, post-discharge default. That is the status the case has remained in from Ocwen's February 2019 "fix" to the present.

Freeman seeks the identity of these leaders of the bankruptcy department at Ocwen because Freeman already holds evidence that these persons were institutionally aware of Ocwen's extensive violations of Federal bankruptcy law for this entire time period. The controlling standard for imposing liability for civil contempt of the bankruptcy discharge injunction is set forth in *Taggart v. Lorenzen*, 139 S. Ct. 1795, (2019). *Taggart* holds that "[b]ased on the traditional principles that govern civil contempt, the proper standard is an objective one. A court may hold a creditor in civil contempt for violating a discharge order where there is not a "fair ground of doubt" as to whether the creditor's conduct might be lawful under the discharge order." *Id.,* 1804. *See also*, *In re Terrell*, 614 B.R. 300, 305 (Bankr. N.D. Ill. 2020) and *Hazelton v. Bd. of Regents for the U. of Wisconsin System*, 952 F.3d 914, 918 (7th Cir. 2020).

Proving that Ocwen had institutional knowledge of its fatally flawed processes, procedures, and mortgage servicing platform for the relevant time period is relevant to demonstrating Ocwen's conduct was objectively unreasonable under *Taggart.* The day-to-day managers of Ocwen's bankruptcy department have specific knowledge of the institutional failures of Ocwen's bankruptcy management process and knowledge of the systemic manner in which Ocwen violated the Bankruptcy Code for this time period. By ordering Ocwen to provide the identity of these individuals, Freeman can determine if these individuals' names appear in the corporate documents which disclose Ocwen's ongoing, systemic violations of the Bankruptcy Code. The disclosures of these names would potentially allow Freeman to demonstrate requisite corporate complicity and knowledge related to the core failings in this case.

As the Court is aware, the issues of corporate complicity and reprehensibility are part of any punitive damages analysis. The Seventh Circuit's punitive damages analysis requires a reprehensibility analysis. The five factors to be considered are:

> "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."

See, *Saccameno v. United States Bank Nat'l Ass'n*, 943 F.3d 1071, 1086 (7th Cir. 2019). Also, the Seventh Circuit stated:

> Under Illinois law, punitive damages may be awarded only if the defendant's tortious conduct evinces a high degree of moral culpability, that is, when the tort is committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others. When the defendant is a corporation, like Ocwen, the plaintiff must demonstrate also that the corporation itself was complicit in its employees' tortious acts.

*Id*. at 1082 (internal quotes and citations omitted). Also, "Illinois law insists on managerial involvement before punitive damages may be awarded against a corporation." *Id*. at 1083-84. Identifying the executives with day-to-day responsibility for Ocwen's bankruptcy department during the relevant time period will allow Freeman to demonstrate that these executives have knowledge of Ocwen's systemic failings in its bankruptcy department by tying their names to existing documents in Freeman's possession from Freeman's discovery efforts.

**Topic Number 11.** Ocwen argues that there is no temporal limitation on this topic. Freeman is willing to agree to limit this topic to the 2012-2019 time frame. Ocwen failed to disclose from its inception until February of 2019 that it utilized the same mortgage servicing software, RealServicing. During this 2012-2019 time frame, Freeman would hope that Ocwen could testify

8

regarding this topic. Ocwen argues that earlier times are not relevant. However, beyond proving liability, Freeman must educate the Court on the depth of Ocwen's failures. Ocwen's internal documents indicate issues with bankruptcy flags being lowered indiscriminately since at least 2012. Ocwen should be required to discuss this topic if for no other reason than to explain how the same issue could continue to exist for seven years when the problem will invariably cause violations of automatic stay or the discharge injunction. This is relevant to both corporate complicity and reprehensibility.

*Topic Number 17.* Ocwen argues that its servicing of Freeman's mortgage loan account from the date of filing her Chapter 13 until the discharge is not relevant. However, the Court will not have the benefit of understanding how Ocwen's servicing conduct pre-discharge impacted its conduct post-discharge without this evidence. This is clearly relevant to the Court's understanding of the magnitude of the issues and wrongdoing in this case and their institutional nature.

*Topic Number 25.* Ocwen urges that the only possible relevant net worth is Ocwen's relevant net worth at the time liability is established. Freeman is willing to accept this proposition. Freeman notes that this is not a proposal that Ocwen ever made during any meet and confer over the topics for examination.

2. <u>Many of Plaintiff's deposition topics, or portions thereof, have no relevance to her claims or defenses.</u>

Ocwen's complaints about the scope of Freeman's topics continues to be rooted in an actual or feigned ignorance of Chapter 13 Bankruptcy and its process. Because these complaints are rooted in this ignorance of bankruptcy law, they require no further response.

*Topic No. 12.* Ocwen complains about Freeman seeking discovery on Ocwen's bungled handling of the proof of claim in this case. Ocwen fails to inform the Court that a straight line can be drawn from Ocwen's bungling of the proof of claim process in Freeman's case and the discharge

9

violation that ultimately occurred. A complete understanding of how Ocwen bungled this process and how it impacted Freeman post-discharge is necessary for the Court to fully grasp the magnitude of the wrongfulness of Ocwen's misconduct in this case.

*Topic No. 13.* Ocwen objects to Topic 13 because it seeks Ocwen's testimony regarding its handling of the objection to the proof of claim in Freeman's bankruptcy case. Like Topic 12, Ocwen fails to inform the Court this bungling of the Proof of Claim is part of the mishandling of Freeman's account that led directly to the ultimate discharge violation and the Court should have this evidence to fully understand exactly how Ocwen mishandled Freeman's account and how the mishandling of the account led directly to the discharge injunction violation rooted back in these earlier mistakes.

*Topics 15 & 16.* Ocwen again either fails to understand Chapter 13 bankruptcy or feigns ignorance in the hopes the Court will limit its testimony in this case. The Court is fully aware that Rule 3002.1 was specifically implemented because of conduct just like Ocwen's conduct here. "Rule 3002.1 was adopted in December 2011 to address a significant problem caused when mortgage companies applied fees and costs to a debtor's mortgage while the debtor was in bankruptcy without giving notice to the debtor and then, based on these post-petition defaults, sought to foreclose upon the debtor's property after the debtor completed the plan. Rule 3002.1 deals with this problem by requiring notice of payment changes and providing an opportunity for the debtor to contest them during the chapter 13 case." *In re Tollios*, 491 B.R. 886, 888 (Bankr. N.D. Ill. 2013). "The requirements of Rule 3002.1, in combination with the requirements imposed by Rule 3001(c), "are designed to allow bankruptcy court determination of any questions regarding the status of a debtor's home mortgage during a Chapter 13 case, eliminating the possibility of unexpected deficiencies at the time the case closes." Eugene R. Wedoff, Proposed New

Bankruptcy Rules on Creditor Disclosure and Court Enforcement of the Disclosures – Open for Comment, 83 AM. BANKR. L.J. 579, 584 (2009)." *In re Gravel*, 601 B.R. 873, 883 (Bankr. D. Vt. 2019), vacated, 6 F.4th 503 (2d Cir. 2021). The Court can also take judicial notice that is not Ocwen's first rodeo with a discharge injunction violation related to mishandling a mortgage loan account. See *Saccameno v. United States Bank Nat'l Ass'n*, 943 F.3d 1071, 1086 (7th Cir. 2019), *Freeman v. Ocwen Loan Servicing, Inc*., 219CV00085JMSDLP, 2020 WL 1328640 (S.D. Ind. Jan. 30, 2020).

***Topic No. 18.*** Topic 18 covers matters that bear upon Ocwen's ongoing violation of the discharge injunction. Ocwen has wrongfully held Freeman's account in default due to its discharge injunction violation since May 2018 and failed to correct the violation in February of 2019. Ocwen has failed to tender insurance proceeds to Freeman necessary to fix her damaged roof based upon this default status. This conduct is part of Ocwen's ongoing violation of the discharge injunction in this case and is therefore relevant. Ocwen retains these funds to this day.

***Topic No. 19.*** Topic 19 seeks statistical information regarding how many of Ocwen's mortgage loan accounts are listed as delinquent within 45 days of discharge. The basic logic is that if Ocwen has complied with the Rule 3002.1 notice and has not wrongfully assessed fees and charges then a post-discharge debtor could not be "delinquent" within 45 days of discharge. This is because "delinquent" status under Ocwen's (and mortgage servicing standards) would not consider the loan delinquent until after the borrower had failed to make a payment for more than 45 days. This is relevant to determine the magnitude of Ocwen's law-breaking conduct with respect to the Bankruptcy Code.

11

***Topic Nos. 20-23.*** Ocwen's allegation that the various consent decrees are irrelevant misses the mark. The district court in *Saccameno* found the consent decrees relevant evidence of corporate complicity:

> First, there is sufficient evidence in the record that Ocwen's management was on notice of potential problems with its loan servicing practices throughout the company generally. For example, as mentioned above, see Part II.C.2, supra, Saccameno's exhibits included consent orders that Ocwen entered into with state and federal regulatory bodies. These exhibits showed that, based on investigations conducted in 2010 and 2011, state and federal regulatory agencies had raised a host of concerns regarding Ocwen's handling of distressed loans […] Ocwen appears to concede the consent orders constitute evidence of corporate complicity.

*Saccameno v. Ocwen Loan Servicing, LLC,* 372 F. Supp. 3d 609, 635 (N.D. Ill. 2019). The portions of the consent decrees addressing Ocwen's failure to properly service mortgage loan accounts in bankruptcy are relevant, highly probative, competent evidence Freeman can use to establish Ocwen's notice and knowledge of these very serious problems among the highest-ranking executives at Ocwen. The consent decrees are probative of the question of corporate complicity, recidivism, repeated rather than isolated actions, and deliberate indifference. This is the type of evidence that Freeman is required to present to support a finding of liability and to educate the Court on the magnitude of the wrongdoing to inform a proper remedy. The Seventh Circuit's decision in *Saccameno* also pointed to consent decrees (including those offered here) to find Ocwen was a recidivist. "[T]he record contains evidence that Ocwen was a recidivist. The consent decrees described how it had treated other customers as it did Saccameno, and that it had continued its ways despite repeated warnings from regulators. The number of opportunities Ocwen had to fix its mistakes is the core fact that justifies punishment in this case." *Id*. at 1087-88.

*Topic No. 24.* Much like the consent decrees, the Risk Convergence Reports are Ocwen internal documents listing all of the areas where Ocwen's systems and processes failed and potentially harmed consumers or violated the law. There are categories within these documents that address Ocwen's bankruptcy failures that are relevant to the dispositive issues in this case. These documents are relevant to prove Ocwen's notice and knowledge of these very serious problems among the highest-ranking executives at Ocwen. The RCRs are also probative of the question of corporate complicity, recidivism, repeated rather than isolated actions, and deliberate indifference on the part of Ocwen's corporate leadership and Ocwen corporately. Also, Freeman does not agree that the RCRs do not span the relevant time period. Once the CFPB discovered the RCRs in its audit of Ocwen's practices and their existence became widely known, Ocwen simply changed the name of these reports so that Ocwen could evade discovery of internal documents that catalog its litany of infamous failures as a mortgage servicer. Ocwen continues to play word games with these reports rather than properly produce the reports since Ocwen changed the name of these reports.

**B. Plaintiff should be barred from seeking legal opinions and/or conclusions from PHH's corporate representative.**

This is another argument properly classified as a blinding flash of the obvious. Freeman has never sought Ocwen's legal opinions and frankly doesn't care what Ocwen's legal opinion is on these matters. The *fact is* that Ocwen assumed certain obligations and made certain promises to perform certain actions or refrain from performing certain actions in each of the consent decrees. Freeman's examination is concerned with discussing whether or not Ocwen acted in compliance with these assumed obligations of performance. Ocwen's legal opinion of what is "legal" has been repeatedly proven wrong. Ocwen seems to confuse testimony that might be damaging with testimony that would be damaging to Ocwen's case in chief. ""Relevant evidence is inherently

13

prejudicial. . . . Rule 403 was never intended to exclude relevant evidence simply because it is detrimental to one party's case; rather, the relevant inquiry is whether any unfair prejudice from the evidence substantially outweighs its probative value." *Cook v. Hoppin*, 783 F.2d 684, 689 (7th Cir. 1986) (quotations and citations omitted)."

### C. Plaintiff should be Barred from Obtaining Testimony regarding Legally Protected and/or Privileged Information.

Ocwen argues Freeman should be prohibited from seeking testimony regarding information "protected from disclosure by New York Bank Law § 36." As its title suggests, New York Banking Law § 36.10 is a *state* statutory privilege; this case is based on federal question jurisdiction; and Federal Rule of Evidence 501 provides that in such cases, ***federal*** common law regarding evidentiary privileges controls. For these reasons, "no federal court has extended the New York Banking Law privilege to a federal question case[.]" *United States ex rel. Fisher*, 2015 U.S. Dist. LEXIS 82954, CASE NO. 4:12-cv-543, at *14 (E.D. Tex. June 26, 2015). Thus, New York Banking Law §36.10 does not statutorily bar production of the Goldin Reports in this action, as Defendant erroneously suggests. Accordingly, this Court should deny Defendant's call for this Court to create precedent by extending the New York Banking Law privilege to a federal question case.

In *United States ex rel. Fisher v. Ocwen Loan Servicing*, plaintiff Relators issued subpoenas to StoneTurn pertaining to compliance monitoring under the 2012 consent decrees. In response, Ocwen filed a motion for protective order to quash the subpoenas, asserting that the internal reports created by the compliance monitors are protected under New York Banking Law § 36.10's state statutory privilege and the federal bank examination privilege. *Id*. at *7-9. The NYDFS intervened in the proceedings and similarly filed a motion for protective order, raising the

14

same argument regarding the two privileges. The Texas district court denied both the NYDFS and Ocwen's motions for protective order to quash the subpoenas, holding that the New York Banking Law state statutory privilege did not apply. Additionally, the court stated:

> Relators contend that Ocwen lacks standing to assert the bank examination privileges, because 'the bank examination privilege belongs solely to the … banking regulatory entities, and may not be asserted by third parties on behalf of the banking agencies.' *Merchants Bank v. Vescio*, 205 B.R. 37, 42 (D. Vt. 1997). The Court agrees, and finds that for this additional reason, Ocwen's motion [for protective order to quash the subpoena to StoneTurn] should be denied.

*Id*. at *9 n.1. In holding that the New York Banking Law state statutory privilege did not apply, the court noted that Federal Rule of Evidence 501 provides, generally, that state privilege law will apply in diversity cases and federal privilege law, as developed through federal common law, will apply in federal question cases. *Id.* at *10. The court then goes on to apply a two-factor balancing test used in the Fifth Circuit "[w]hen a case involves a privilege that is 'not existent in the [federal] common law but enacted by the (state) legislature[.]'" Upon applying the Fifth Circuit's balancing test to determine whether the state privilege will apply in federal court, the court ultimately held that the New York Banking Law state statutory privilege did not apply.

While the Fifth Circuit's federal common law provides for a balancing test to determine whether a state statutory privilege non-existent in federal common law may be applied in a case brought to a District Court under federal question jurisdiction, the Seventh Circuit has developed no such test. Rather, the Seventh Circuit follows Federal Rule of Evidence 501's general approach: "In … federal question civil cases, federally evolved rules on privilege should apply since federal policy is being enforced." *Cumis Ins. Soc. V. South-Coast Bank*, 610 F.Supp. 193, 197 n.3 (N.D. Ind. June 5, 1985); *see also B.A. v. Bohlmann*, 2010 U.S. Dist. LEXIS 155189, 09-cv-346-wmc, *11 (W.D. Wis. Nov. 12, 2010) ("But here because jurisdiction is premised on a federal question,

15

federal law determines the existence of any privilege.") (citing *Mem'l Hosp. v. Shaddur*, 664 F.3d 1058, 1061 (7th Cir. 1981) (holding that federal law controlled on the question of privilege in federal antitrust action even though complaint contained supplemental state claims); *Dunn v. Wash. County Hosp.*, 429 F.3d 689, 693 (7th Cir. Nov. 17, 2005) (when Defendant attempted to assert privileges under Illinois law, the court stated Defendant "does not explain, however, why these privileges matter to cases under the federal-question jurisdiction. Only in diversity litigation do state evidentiary privileges apply directly, *see* Fed. R. Evid. 501, and [Defendant] does not contend that the privileges he asserts are recognized as a matter of federal common law."); *Baylor v. Mading--Dugan Drug Co.*, 57 F.R.D. 509, 511 (N.D. Ill. Dec. 18, 1972) ("Federal courts have refused to honor state privileges in actions involving enforcement of rights created under federal law.").

As the court in *United States ex rel. Fisher* wisely noted, "no federal court has extended the New York Banking Law privilege to a federal question case[.]" *United States ex rel. Fisher*, 2015 U.S. Dist. LEXIS 82954 at *14. Accordingly, the Seventh Circuit has never recognized the New York Banking Law statutory privilege as an available privilege in a case brought under federal-question jurisdiction nor is it likely to do so in the future –which explains why Defendant here did not cite any Seventh Circuit case in support of its argument that New York Banking Law § 36 provides a statutory privilege in this case.

In fact, Ocwen cites three cases in support of its contention that "New York courts have consistently enforced these protections from disclosure of regulatory supervisory materials." Yet, Ocwen's characterizations of each of these three cases are misleading and they do not support an argument for application of the New York Banking Law privilege in the instant case, as none of

16

those three cases held that New York Banking Law protects subpoenaed and/or requested materials from disclosure where a private entity – not NYDFS – opposes production.

For example, regarding *Alaska Elec. Pension Fund*, cited by Ocwen with the parenthetical "(denying motion to compel production of documents, apply [sic] N.Y. Banking Law § 36(10) because 'New York Banking Law protects DFS materials from disclosure.')", Ocwen's characterization is incorrect. Though the plaintiffs' motion to compel in *Alaska Elec. Pension Fund* was denied without prejudice, the motion was ***not*** so denied on the basis that the defendant was protected by and had standing under New York Banking Law § 36.10, as suggested by Ocwen. Rather, the motion to compel was denied on a relevancy basis due to Plaintiff's overly broad discovery requests. *Alaska Elec. Pension Fund v. Bank of America Corp.*, 14-CV-7126 (JMF), 2016 WL 6779901, at *3-4. In fact, the only mention the court makes of the New York Banking Law § 36.10 in *Alaska Elec. Pension Fund* – which is the quote from *Alaska Elec. Pension Fund* cited by Defendant – is when the court is stating the defendant banks' arguments regarding their alleged privilege under law pertaining to the relevant documents. *Id.* at *5. The court's following analysis in support of its conclusion that "some of the materials Plaintiffs seek cannot – at least in the first instance – be obtained via subpoena from Defendants[]" is based entirely on federal regulations pertaining to the Board of Governors of the Federal Reserve System (FRB) and the Office of the Comptroller of the Currency (OCC), which provide generally that Plaintiff must first exhaust administrative remedies with each respective agency to obtain the relevant documents before seeking the court's assistance. *Id.* at *6. The court provides no analysis at all regarding New York Banking Law § 36.10 and thus certainly did not hold that New York Banking Law protects subpoenaed and/or requested materials from disclosure where a private entity – not NYDFS – opposes production, as suggested by Ocwen's parenthetical. Similarly, the second case cited by

17

Ocwen, *Clark v. Flynn*, 9 A.D.2d 249 (N.Y. App. Div. 1959) concerned a request for application of the New York Banking Law privilege by the Superintendent of Banks of the State of New York, not a private entity, as is the case here.

Finally, even if the Court did accept Ocwen's invitation to create precedent by extending the New York Banking Law privilege to a federal question case, Ocwen lacks standing to assert New York Banking Law § 36 because it "belongs solely to the … banking regulatory entities, and may not be asserted by third parties on behalf of the banking agencies." *United States ex rel. Fisher v. Ocwen Loan Servicing quoting Merchants Bank v. Vescio*, 205 B.R. 37, 42 (D. Vt. 1997); *see also Chery v. Conduent Education Services, LLC*, No. 1:18-CV-75 (DNH/CFH), 2020 WL 4783167, at *9 (N.D.N.Y. Aug. 18, 2020) ("[T]he undersigned was unable to find any caselaw applying that statutory provision to prohibit disclosure of such documents by a private entity."). Here, as stated above, the NYDFS has not intervened or sought to assert the New York Banking Law privilege.

Accordingly, because the Seventh Circuit has never recognized the New York Banking Law statutory privilege as an available privilege in a case brought under federal-question jurisdiction and because Ocwen lacks standing to invoke New York Banking Law § 36, the Court should decline to accept Ocwen's argument that Freeman "should be prevented from seeking testimony regarding information protected from disclosure by New York Banking Law § 36."

### D. Plaintiff should be Barred from Obtaining Testimony regarding Topics related to Ocwen Financial Corporation, whose Deposition has not been Noticed.

Freeman withdraws topics 26 and 27. Freeman's counsel notes these objections were never made in conference by Ocwen.

18

**Conclusion**

For the reasons identified herein, Freeman respectfully requests the Court deny Defendant Ocwen Loan Servicing, LLC.'s Motion for Protective Order [Doc. 21] and order it to produce a corporate representative to answer questions about the Deposition Topics.

Respectfully submitted,

*/s/ Nick Wooten*
Nick Wooten
**NICK WOOTEN, LLC**
5125 Burnt Pine Drive
Conway, AR 72034
nick@nickwooten.com
*Counsel for the Plaintiff*


*/s/ Travis W. Cohron*
Travis W. Cohron, No. 29562-30
Olivia A. Hess, No. 36166-49
**CLARK, QUINN, MOSES, SCOTT & GRAHN, LLP**
320 N. Meridian Street, Suite 1100
Indianapolis, IN 46204
Telephone: (317) 637-1321
tcohron@clarkquinnlaw.com
*Counsel for the Plaintiff*

## CERTIFICATE OF SERVICE

      I hereby certify that on July 20, 2022, a copy of the foregoing was filed electronically. Notice of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

                                    */s/ Nick Wooten*
                                    Nick Wooten

**NICK WOOTEN, LLC**
5125 Burnt Pine Drive
Conway, AR 72034