**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF INDIANA**
**Indianapolis Division**

| | | | |
|---|---|---|---|
| In re: | ) | | |
| | ) | | |
| DEMONA FREEMAN, | ) | Case   No.   12-04713-JJG-13 | |
| Debtor. | ) | | |

---

| | | |
|---|---|---|
| DEMONA FREEMAN, | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Adversary No. 21-50006 |
| | ) | |
| PHH MORTGAGE f/k/a OCWEN LOAN | ) | |
| SERVICING, LLC, and OCWEN FINANCIAL | ) | |
| CORPORATION, | ) | |
| *Defendants*. | ) | |

**RESPONSE IN OPPOSITION TO DEFENDANT PHH MORTGAGE**
**CORPORATIONS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

| | Page |
|---|---|
| **TABLE OF AUTHORITIES** …………………………………………….. | 4 |
| **I. INTRODUCTION**………………………………………………………… | 9 |
| **II. STANDARD OF REVIEW**……………………………………………. | 11 |
| **III. STATEMENT OF MATERIAL FACTS IN DISPUTE**………………………… | 11 |
| **IV. STATEMENT OF ADDITIONAL FACTS NOT IN DISPUTE**……………………………………………………... | 25 |
| **V. ARGUMENT**………………………………………………………… | 34 |
| A. Freeman has Appropriately Sought Relief in Accordance with the Court's Inherent Contempt Powers and Those Provided Under 11 U.S.C. § 105 ……….. | 34 |
| B. As There is no Fair Ground of Doubt that the Order of Discharge Barred its Conduct, Ocwen Should be Held in Contempt………………………………… | 37 |
| 1.   Ocwen received notice of the Order of Discharge, and it was clear and | |

| | |
|---|---|
|     unambiguous………………………………………………………… | 37 |
|   2.  Ocwen was not "merely seeking to enforce its lien."…………………… | 38 |
|   3.  At a minimum, there is a fair ground of doubt as to whether Ocwen sought to collect discharged amounts in violation of 11 U.S.C. § 524…….. | 39 |
|     i. There is no fair ground of doubt as to whether Ocwen's payment misapplications, efforts to collect amounts stemming therefrom, were in violation of 11 U.S.C. § 524………………………………………….. | 40 |
|     ii. There is no fair ground of doubt as to whether Ocwen's foreclosure filings were in violation of 11 U.S.C. § 524, did not "merely seek to enforce its lien"………………………………………………………... | 42 |
|     iii. There is no fair ground of doubt as to whether Ocwen's post-discharge credit reporting was in violation of 11 U.S.C. § 524, did not "merely seek to enforce its lien"…………………………………………….. | 43 |
|     iv. There is no fair ground of doubt as to whether Ocwen's post-discharge calls and collection letters were in violation of 11 U.S.C. § 524, did not "merely seek to enforce its lien"………………………………………….. | 44 |
| C. In Addition to Finding it in Contempt, the Court Can and Should Sanction Ocwen…………………………………………………………………… | 47 |
|   1.  Ocwen's long standing knowledge of its widespread failure to the requirements of Chapter 13 bankruptcies evidences bad faith…………… | 48 |
|   2.  Ocwen's record of "continuing and persistent violations" evidences bad faith…..……………………………………………………………… | 49 |
| D. Freeman is Entitled to Relief and Requests this Matter be Set for an Evidentiary Hearing ……………………………………………………… | 50 |
|   1.  Freeman does not have unclean hands…………………………….….. | 50 |
|   2.  The Court can and should award relief to Freeman for her losses in an amount to be determined at trial…………………………………………. | 53 |
|   3.  The Court can award "make-whole relief" in an amount and form to be determined by the court…………………………………………………. | 54 |
| E. The Doctrine of Equitable Estoppel Mandates Ocwen Be Estopped From Continuing to Hold the Loan in Default or Collecting Amounts Stemming Therefrom……………………………………………………………… | 56 |
| F. Ocwen Concurrent Violations of the Confirmed Chapter 13 Plan, FRBP | |

| | |
|---|---|
| 3002.1, and Orders Dated October 26, 2012 and April 8, 2013, also Warrant the Entry of Sanctions and Further Evidence Bad Faith…………………………………………………………………………… | 60 |
| **VI. CONCLUSION**…………………………………………………………… | 61 |

# TABLE OF AUTHORITIES

| Cases | Page |
|---|---|
| *Aiello v. Providian Fin. Corp.*, 239 F.3d 876 (7th Cir. 2001) | 53 |
| *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) | 11 |
| *Arrington v. Ocwen Loan Servicing, L.L.C.* (*In re Arrington*), 2017 WL 4271085 | 41 |
| *Beckhart v. Newrez, LLC*, 31 F.4th 274, 277 (4th Cir. 2022) (Chapter 11) | 50 |
| *Best v. Ocwen Loan Servicing, LLC*, No. 15-cv13007, 2016 WL 125875 (E.D. Mich. 2016) | 50 |
| *Brown v. Branch*, 758 N.E.2d 48 (Ind. 2001) | 56 |
| *Campbell v. Countrywide Home Loans, Inc.*, 545 F.3d 348 (5th Cir. 2008) | 35 |
| *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676 (7th Cir. 2011) | 19 |
| *Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) | 34 |
| *Continental Bank, N.A. v. Modansky*, 129 B.R. 159, 164 (N.D. Ill. 1992) | 53 |
| *Darst v. Interstate Brands Corp.*, 512 F.3d 903 (7th Cir. 2008) | 11 |
| *Dwyer Instruments Inc. v. Sensocon Inc.*, 2012 WL 3207254, at *19 (N.D. Ind. Mar. 23, 2012) | 53 |
| *Englert v. Ocwen Loan Servicing*, 495 B.R. 266 (Bankr. W.D. Pa. 2013) | 49 |
| *Figueroa v. Banco Popular de P.R.* (*In re Figueroa*), Nos. 09-07725 (MCF), 19-00032, 2021 WL 5815641, at *4 (Bankr. D.P.R. Dec. 7, 2021) | 40 |
| *Fisher v. Apostolou*, 155 F. 3d 876 (7th Cir. 1998) | 35 |
| *Forson v. Nationstar Mortg., LLC* (*In re Forson*), 583 B.R. 704 (Bankr. S.D. Ohio 2018) | 43 |
| *Goodyear Tire & Rubber Co. v. Haeger*, ___ U.S. ___, 137 S.Ct. 1178, 197 L.Ed.2d 585 (2017) | 34 |
| *Goya Foods, Inc. v. Wallach Mgmt. Co.* 290 F.3d 63 (1 Cir. 2002) | 55 |
| *Grogan v. Garner*, 498 U.S. 279 (1991) | 9 |

| | |
|---|---|
| *In re Adams*, 2010 WL 2721205 (Bankr. E.D. N.C. July 7, 2010) | 43, 50, 55 |
| *In re Alley*, No. 09-21500, 2014 WL 2987656 (Bankr. D. Me. July 1, 2014) | 36, 49 |
| *In re Anderson*, 550 B.R. 228 (S.D.N.Y. Feb. 22, 2016) | 35 |
| *In re Cano*, 410 B.R. 506 (Bankr. S.D. Tex. 2009) | 35 |
| *In re Chicor Life Ctr., LC*, 553 B.R. 61 (Bankr. D. S.C. 2016) | 35 |
| *In re Culpepper*, 481 B.R. 650 (Bankr. D. Or. 2012) | 44 |
| *In re Dewitt*, 644 B.R. 385 (Bankr. S.D. Oh. 2022) | 39 |
| *In re Earl*, 140 B.R. 728 (Bankr. N.D. Ind. 1992) | 35, 60 |
| *In re Ferris*, 611 B.R. 701 (Bankr. M.D. Fla. 2019) | 42 |
| *In re Fivecoate*, 634 B.R. 720 (Bankr. D.S.C. 2021) | 49, 57, 59 |
| *In Re Golden*, 630 B.R. 896 (Bankr. E.D. N.Y. 2021) | 37 |
| *In re Goodfellow*, 298 B.R. 358 (Bankr. N.D. Iowa 2003) | 43 |
| *In re Gravel, 6 F.4th 503 (2d Cir. 2021)* | 60, 61 |
| *In re Green*, No. 12-13410, 2014 WL 1089843 (N.D. Ohio Mar. 19, 2014) | 49 |
| *In re Griffin*, 415 B.R. 64, 71 (Bankr. N.D.N.Y. 2009) | 55 |
| *In re Harbour Oaks Dev. Corp.*, 228 B.R. 801 (Bankr. M.D. Fla. 1999) | 42 |
| *In re Harlow v. Wells Fargo & Co.*, No. 17-71487, 2022 WL 17586716, (Bankr. W.D. Va. Dec. 12, 2022) | 36 |
| *In re Jones*, 2012 WL 5385682 (Bankr. E.D. Ky. Nov. 2, 2012) | 42 |
| *In re Larson*, 862 F.2d 112 (7th Cir. 1988) | 57 |
| *In re Lempesis*, 557 B.R. 659 (2016) | 43 |
| *In re Lescinskas*, 628 B.R. 377 (Bankr. D. Mass. 2021) | 61 |
| *In re McKain*, No. 08-10411, 2009 WL 2848988, at *5 (Bankr. E.D. La. May 1, 2009) | 49 |
| *In re Nibbelink*, 403 B.R. 113 (Bankr. M.D. Fla. 2009) | 47 |

| | |
|---|---|
| *In re Ogen*, 532 B.R. 329 (Bankr. D. Co. 2014) | 40 |
| *In re Pope*, 647 B.R. 597, 624 (Bankr. D.N.H. 2022) (Chapter 13) | 50 n.14 |
| *In re Ramos*, 2013 WL 5461859 (Bankr. S.D.N.Y. Oct. 1, 2013) | 39 |
| *In re Ridley*, 572 B.R. 352 (Bankr. E.D. Okla. 2017) | 41 |
| *In re Rizzo-Cheverier*, 364 B.R. 532 (Bankr. S.D.N.Y. 2007) | 42 |
| *In re Rodriguez*, 396 B.R. 436 (Bankr. S.D. Tex. 2008) | 37 |
| *In re Salazar*, 2016 WL 6068819 (Bankr. S.D. Tx. 2016) | 40 |
| *In re Schafer*, No. 07–61297–13, 2013 WL 1197612 (Bankr. D. Mont. Mar. 25, 2013) | 49 |
| *In re Scott*, 2015 WL 9986691 (Bankr. N.D. Okla. July 28, 2015) | 44 |
| *In re Seaver*, 640 B.R. 555, 557 (Bankr. D.S.C. 2022) (Chapter 13) | 50 n.14 |
| *In re Stambaugh*, 531 B.R. 191 (Bankr. S.D. Ohio 2015) | 50 |
| *In re Sterling*, 933 F.3d 828 (7th Cir. 2019) | 36 |
| *In re Sterling*, 2013 Bankr. LEXIS 542 (Bankr. N.D. Ind. Jan. 31, 2013) | 36 |
| *In re Swink*, 2021 WL 4768091 (Bankr. M.D.N.C. Oct. 12, 2021) | 41 |
| *In re Taylor*, 2012 WL 1808858 (Bankr. S.D. Ind. May 17, 2012) | 40 |
| *In re Todt*, 567 B.R. 667 (Bankr. D.N.H. 2017) | 44-47 |
| *In re Trevino*, 535 B.R. 110 (Bankr. S.D. Tx. 2015) | 40 |
| *In re Weiss*, 111 F.3d 1159 (4th Cir. 1997) | 34 n. 9 |
| *In re Wilson*, 2011 WL 6887729 (Bankr. S.D. Ind., Dec. 28, 2011) | 36 |
| *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934) | 9 |
| *Loewe v. Weltman, Weinberg & Reis Co., L.P.A.*, No. 19-12187, 2020 WL 409655 (E.D. Mich. Jan. 24, 2020) | 54 |
| *Marrama v. Citizens Bank of Mass.*, 127 S.Ct. 1105, 549 U.S. 365, 166 L.Ed.2d 956 (2007) | 35 |

| | |
|---|---|
| _Montano v. First Light Federal Credit Union_ (In re Montano), 398 B.R. 47 (Bankr.D.N.M.2008) | 36 |
| _Motichko v. Premium Asset Recovery, Inc._ (_In re Motichko_), 395 B.R. 25 (Bankr.N.D.Ohio 2008) | 35-36 |
| _Roger Todd v. Ocwen Loan Servicing, LLC, et al., No. 2:19-cv-0085-JMS-DLP (S.D. Ind.)_ | 49 |
| _Romanucci & Blandin, LLC_ v. _Lempesis_, No. 16 C 9710, 2017 WL 4401643, at *6–7 (N.D. Ill. May 4, 2017) | 48 n.13, 49 |
| _Saccameno v. Ocwen Loan Servicing, LLC_, 372 F.Supp.3d 609 (N.D. Ill. 2019) | 12 |
| _Saccameno v. Ocwen Loan Servicing_, 943 F.3d 1071 (7th. Cir. 2019) | |
| _Smith v. GC Servs. Ltd. P'ship_, 986 F.3d 708, 710 (7th Cir. 2021) | 10 |
| _Taggart v. Lorenzen_, _ U.S. _, 139 S. Ct. 1795, 1804 (2019) | _passim_ |
| _Town of New Chicago v. City of Lake Station ex rel. Lake Station Sanitary Dist._, 939 N.E.2d 638 (Ind. Ct. App. 2010) | 57 |
| _United States v. Asmar_, 827 F.2d 907 (3rd Cir.1987) | 57 |
| _United States v. Mine Workers._, 330 U.S. 258, 303-304, 67 S. Ct. 677,(1 L.Ed. 884 (1947) | 47, 50 |
| _Williams v. CitiFinancial Servicing L.L.C._ (_In re Williams_), 612 B.R. 682 (Bankr. M.D.N.C. 2020) | 41 |
| _Zerand-Bernal Grp., Inc., v. Cox_, 23 F.3d 159 (7th Cir. 1994) | 38 |
| **Statutes** | |
| 11 U.S.C. § 105 | _passim_ |
| 11 U.S.C. § 524 | _passim_ |
| 11 U.S.C. § 1322(b)(5) | 28 |
| **Rules** | |
| Fed. R. Bank. P. 3002.1 | _passim_ |
| Fed. R. Bank. P. 7056 | 11 |
| Fed. R. Civ. P. 37 | 61 n.15 |

| | |
|---|---|
| Fed. R. Civ. P. 56 | 9, 11 |
| S.D. Ind. B-7056-1 | 9 |
| **Other Authorities** | |
| 3 William L. Norton Jr. & William L. Norton III, Norton Bankruptcy Law and Practice § 58:2 (3d ed. 2017) | 47 |

Plaintiff Demona Freeman ("Freeman"), by and through undersigned counsel, pursuant to Fed. R. Civ. P. 56 and S.D. Ind. B-7056-1, respectfully submits this Memorandum In Support of Response In Opposition to Defendant PHH Mortgage Corporation's ("PHH" or "Ocwen") Motion for Summary Judgment.[1]

## I.    INTRODUCTION

When a person files a bankruptcy petition under Chapter 13, they hope to receive what Congress intended – an opportunity to rehabilitate long-term debt, repay creditors to the best of their ability, and obtain a fresh financial start. Because of this, "a central purpose of the Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt." *Grogan v. Garner*, 498 U.S. 279,286-87 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)) (internal quotation marks omitted). Unfortunately, but not surprisingly, that is not what happened here.

This is a case not only about Freeman, and how Ocwen's placement of her loan in a manufactured state of default affected her, but also one about recidivism–Ocwen continuing to disregard the requirements of servicing loans in a Chapter 13 bankruptcy. The record irrefutably demonstrates Freeman adhered to all the requirements of her bankruptcy, was deserving of but did not receive the "fresh start" to which she was entitled, and that her life

---

[1] At the outset Freeman notes the term "Ocwen" is used in the memorandum to refer collectively to PHH Mortgage Corporation and Ocwen Loan Servicing, LLC. PHH Mortgage Corporation is the successor by merger to Ocwen Loan Servicing, LLC. Specifically, on October 4, 2018, Ocwen Financial Corporation, a Florida corporation ("Ocwen" or the "Company"), completed its previously announced acquisition of PHH Corporation, a Maryland corporation ("PHH"), pursuant to the Agreement and Plan of Merger, dated as of February 27, 2018 (the "Merger Agreement"), by and among Ocwen, PHH and POMS Corp, a Maryland corporation and a wholly-owned subsidiary of Ocwen ("Merger Sub"). *See* https://www.sec.gov/Archives/edgar/data/873860/000149315218014073/form8-k.htm. As a result of this merger, PHH Mortgage Corporation now stands in the shoes of Ocwen Loan Servicing, LLC. and bears financial responsibility for the liabilities of Ocwen Loan Servicing, LLC.

has been adversely impacted as a result. There is also no dispute here that Ocwen mishandled Freeman's loan, commenced collection activities immediately after the entry of the Order of Discharge (including pursuing foreclosure on two different occasions), begin wrongfully rejecting her single monthly payments, and failed to take any corrective action for *over a year* despite its internal recognition of the problems and her numerous disputes.

As a result, the entirely natural and foreseeable consequence of Ocwen's actions, Freeman has experienced emotional distress, physical manifestations of that stress, marital instability, damage to her credit, invasion of privacy and peace of mind, loss of time, and expense. *See Smith v. GC Servs. Ltd. P'ship,* 986 F.3d 708, 710 (7th Cir. 2021) (finding that abusive debt-collection practices lead to "marital instability," and "invasions of individual privacy"). Further, and most concerning to Freeman, she remains in jeopardy of losing her home as Ocwen will not allow her to recommence making single monthly payments, continues to seek to collect amount it is not entitled to (including an inexplicable advance balance of $44,462.89 as of December 31, 2019) and, will assuredly initiate foreclosure proceedings absent judicial intervention. *See* Ocwen_Freeman 004832 [Filing No. 83-4].

Despite the foregoing, Ocwen seeks summary judgment on various grounds and denies Freeman has been harmed *in any way*. In fact, it blames Freeman, accuses her of having unclean hands, and [again] belittles her with isolated snippets of deposition testimony. *See, e.g.*, [D.E. 269 at 1, 12]; *see also* Newton Dep. 32:13-34:25 [Filing No. 83-29]. While true Freeman does not possess a mastery of legal terminology, and cannot *literally* read other peoples minds, her experience is entirely unjustifiable. She has done nothing wrong and deserves the fresh start that would have allowed her to live without fear

of losing her home. For these reasons and those detailed below, summary judgment should be denied and this matter should be set for trial.

## II.    STANDARD OF REVIEW

Federal Rule of Bankruptcy Procedure ("FRBP") 7056 makes Federal Rule of Civil Procedure ("FRCP") 56 applicable in bankruptcy proceedings. In reaching a determination about whether summary judgment should be granted, a court is to construe the cited evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). "[D]isputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III.    STATEMENT OF MATERIAL FACTS IN DISPUTE

1.    Paragraph 10 of Ocwen's Statement of Undisputed Material Facts proclaims "[a]n error was made during the initial reconciliation after the close of the Bankruptcy in February 2018, and disallowed amounts were not removed from the accounting on the Loan. This was *a* human error." (internal citations omitted) (emphasis added) This statement is demonstrably false. The Loan was in a manufactured state of delinquency and default before and after any reconciliation, and the errors made by Ocwen in relation to the Loan are not at all isolated to disallowed amounts. *See generally* Patterson Expert Report [Filing No. 83-25]. In addition, while later failures to correct its violative conduct could conceivably be construed as human error*s*, the root cause was more likely known and widespread deficiencies with its system of record - REALServicing. *See* Ocwen_Freeman 011126 - 011133, attached to *Appendix to Plaintiff's Memorandum in Opposition to Ocwen's Motion*

*for Summary Judgment* ("Appendix") as ***Exhibit G* (sealed)**. Further, like in *Saccameno v. Ocwen Loan Servicing, LLC*, 372 F.Supp.3d 609 (N.D. Ill. 2019), Ocwen does not identify what human failure it contends failed to remove said "disallowed amounts" nor was such an individual identified in its initial disclosures or via discovery.

2.      Paragraph 10 of Ocwen's Statement of Undisputed Material Facts proclaims "[t]his error occurred despite Ocwen's implementation and maintenance of procedures designed to prevent such an error." This is in dispute. As detailed above, and within the Expert Report of Bernard J. Patterson, Ocwen committed numerous servicing errors, not just a singular "error." *See, e.g.*, Patterson Expert Report ¶¶ 84-97 [Filing No. 83-25]. Moreover, Ocwen does not identify which procedures it implemented or maintained to prevent the servicing "error" it admits to, let alone the countless other errors identified here and within the Expert Report of Bernard J. Patterson.

3.      Paragraph 11 of Ocwen's Statement of Undisputed Material Facts proclaims "Plaintiff did not submit any payment to Ocwen in June 2018." This statement is demonstrably false. Freeman called Ocwen twice in June of 2018 attempting to make a payment. *See* Ocwen_Freeman 003634 [Filing No. 83-2] and Ocwen_Freeman 003636 [Filing No. 83-2]. Those efforts were each rejected. Ocwen told Freeman they would only accept payment of the entire reinstatement amount, much more than the single monthly payment, and an amount she did not in fact owe. *See* Verdooren AP Decl. ¶ 22 [Filing No. 83-41]. Despite this, and the fact that her subsequent attempts to make payment via check were unsuccessful, Ocwen received funds from Freeman sufficient to satisfy her June - August of 2018 payment obligations. Patterson Expert Report ¶ 93 [Filing No. 83-25].

4.      Paragraph 11 of Ocwen's Statement of Undisputed Material Facts proclaims "Ocwen also did not receive any payments from Plaintiff between July 2018 and December 2018." This is incorrect. Ocwen told Freeman in June 2018 they would *only* accept payment of the entire reinstatement amount, much more than the single monthly payment she owed. Verdooren Dep. 129:18-19 [Filing No. 83-10]; Verdooren AP Decl. ¶ 22 [Filing No. 83-41]. Despite this, Freeman submitted payment to Ocwen by check for her monthly payments in July, August, September, October and November 2018. Demona Freeman Dep. 98:6-11 [Filing No. 83-15]. Those checks were neither deposited nor returned. Ocwen's records do not reflect this because its system of record does not track such information. *See* CGS-CMS - Cash Rejection Specifics - Q1-2014-001….Ocwen_Freeman006883, attached to Appendix as ***Exhibit E* (sealed)**; Misidentified Payments Are Misapplied or Not Remitted See Ocwen_Freeman006885, attached to Appendix as ***Exhibit E* (sealed)**.

5.      Paragraph 12 of Ocwen's Statement of Undisputed Material Facts states, "As a result of subsequent investigations and corresponding corrections to the Loan - as described below - BONY agreed to voluntarily dismiss the Second Foreclosure Case … ." This is incorrect. The decision to dismiss the Second Foreclosure Case was controlled by Ocwen.  Further, there is nothing in the record to support the representation that the Second Foreclosure Case was voluntarily dismissed "as a result of subsequent investigations" versus the filing of the instant lawsuit. The alleged "corrections" to the Loan would not independently justify the dismissal of the Second Foreclosure Case, as Ocwen continued to hold the Loan in a manufactured state of default.

6.      Paragraph 15 of Ocwen's Statement of Undisputed Material Facts states, "After receipt, Ocwen retained Maria Vathis of Bryan Cave Leighton Paisner LLP ("Bryan

Cave") to conduct the investigation and prepare the response to Purported NOE No. 1." This is incorrect.   While true Ocwen retained outside counsel, Maria Vathis, it provides no evidence to support the scope or purpose of her engagement. Its policies and procedures also do not contain any language providing guidance about the retention of outside counsel for purposes of responding to notices of error. The record suggests she was retained to merely prepare written responses to NOE No. 1, NOE. No. 2, and NOE No. 3. She had no role in the corresponding investigations or in guiding any search for responsive documents. *See* Vathis Dep. 11:6-13 [Filing No. 83-30]. Any changes made in response to Freeman's Notices of Error, and why these changes were made, were made internally by Ocwen. Vathis Dep. 23:22-25; 24:1 [Filing No. 83-30].   Her response was required to be confirmed and approved by Ocwen. Vathis Dep. 11:14-17 [Filing No. 83-30]. She relied entirely on what Ocwen told her. Vathis Dep. 25:1-5 [Filing No. 83-30]. She could not speak to the nature or extent of Ocwen's own internal investigative efforts or responses to Freeman's notices of errors. Vathis Dep. 12:6-11 [Filing No. 83-30]. She did not have access to Ocwen's servicing system of record or the ability to access any information or documents directly. Vathis Dep. 14:7-14 [Filing No. 83-30]. As of March 9, 2022, Ms. Vathis did not even know if Ocwen had a specific department responsible for investigating or responding to notices of error under RESPA. Vathis Dep. 14:19-15:2 [Filing No. 83-30]. Per Ms. Vathis, the people most knowledgeable about the conclusions found within Ocwen's responses to Freeman's notices of error are Wendy Mclaughlin, Tom Burton, and Alex Gross. Vathis Dep. 9:19-11:5; 15:7-11 [Filing No. 83-30]; Vathis Dep. 9:19-24 [Filing No. 83-30]. Most of her work for Ocwen involves litigating cases; her work in responding to Freeman's Notices of Error was "really sort of a one-off." Vathis Dep. 17:16-24 [Filing No. 83-30].

7.     Paragraph 19 of Ocwen's Statement of Undisputed Material Facts states, "Ocwen's counsel Maria Vathis was tasked with investigating and responding to Plaintiff's purported Notices of Error." As set forth in detail above, there is nothing in the record to support what Maria Vathis was "tasked with," but she certainly did not play any substantive role in investigating Freeman's Notices of Error. Ms. Vathis relied entirely on what Ocwen told her. Vathis Dep. 25:1-5 [Filing No. 83-30].

8.     Paragraph 19 of Ocwen's Statement of Undisputed Material Facts also states, "Ms. Vathis worked with Ocwen to gather information in order to prepare responses to each purported Notice of Error." This is incorrect. As detailed above, Ms. Vathis prepared responses to each Notice of Error based only upon the information provided to her by Ocwen. She did nothing more than take Ocwen's investigation and formulate a written response. See Vathis Dep. 55:11-16 [Filing No. 83-31]. She does not recall personally requesting any documents from Ocwen. *See* Vathis Dep. 56:1-3 [Filing No. 83-31]. A question of fact exists as to whether Ms. Vathis even  prepared the responses to Freeman's Notices of Error herself or whether they were merely typed by someone at her office. *See* Vathis Dep. 59:16-25 [Filing No. 83-31].

9.     Paragraph 20 of Ocwen's Statement of Undisputed Material Facts states, "As a result of the investigations into Plaintiff's purported Notices of Error, between November 23, 2018 and January 3, 2019, several changes were made to the Loan in order to correct the previous failure to remove disallowed amounts from the Loan." This is incorrect. There is nothing in the record to support the assertion changes were made to the Loan as a result of investigations into Freeman's Notices of Error versus in response to the filing of the instant matter. Likewise, Ocwen did not "fail[] to remove disallowed amounts from the Loan", it

paid itself amounts that were disallowed, then refunded them via its payment reversals and reapplications. *See* Patterson Expert Report ¶¶  25(d), 42(d), 59, and 60 [Filing No. 83-25].

10.     Paragraph 20 of Ocwen's Statement of Undisputed Material Facts also states, "Following these changes, the only reason why the loan was not current was because Plaintiff had not made any payments since May 2018." This is incorrect. The Loan remained in default because Ocwen rejected payments, misapplied funds, continued to assess fees and charges, did not decelerate the Loan until much later, and never notified Freeman she could resume making her monthly payments. *See* Patterson Expert Report ¶¶ 25(d), 42(d), 59, and 60 [Filing No. 83-25]; *see also* Ocwen_Freeman 004894 [Filing No. 83-4] (The Loan was not decelerated until after Ocwen responded to Freeman's Notices of Error); Freeman Declaration ¶ 54 [Filing No. 83-20].

11.     Paragraph 20 of Ocwen's Statement of Undisputed Material Facts also states, "Further, as Mr. Patterson, Mr. Goldman, and Ocwen agree, after Ocwen performed the final reconciliation in December 2018, the Loan accurately reflected that it was paid through July 1, 2018, and due for August 1, 2018. This is because, as of August 7, 2019, Ocwen was seeking collection only of amounts that were lawfully owed in accordance with its written policies and procedures." (internal citations omitted). This is incorrect. It is incorrect that Ocwen was seeking collection "only of amounts that were lawfully owed in accordance with its written policies and procedures." Improper fees and costs, including but not limited to previously assessed foreclosure fees and costs that Ocwen waived on January 3, 2019 but reassessed to the Loan a mere 5 days later, were assessed to Freeman's Loan long before August 7, 2019 and have remained on her Loan to this day. *See* Patterson Expert Report ¶¶ 83 and 97 [Filing No. 83-25]); *see also* Statement of Additional Facts Not in Dispute

("SAFND") ¶ 31. Further, Ocwen continues to assess improper fees and costs to the Loan in the form of an advance balance. *See* SAFND ¶ 36 (citing Ocwen_Freeman004832 [Filing No. 83-4]). As of December 31, 2019, this advance balance was $44,462.89. *Id.*

12.     Paragraph 21 of Ocwen's Statement of Undisputed Material Facts states, "During the process of the investigation and while changes were being made to the Loan, Ocwen also began taking steps to decelerate the Loan so that the Second Foreclosure Case could be stopped." This is incorrect. The Loan was not decelerated until after Ocwen responded to Freeman's Notices of Error. *See* Ocwen_Freeman 004894 [Filing No. 83-4]. Further, during the "process" of the investigation, Ocwen continued to pursue foreclosure, even going so far as to file a Motion to Dismiss Freeman's counterclaims. [Filing No. 83-37].

13.     Paragraph 21 of Ocwen's Statement of Undisputed Material Facts also states "Specifically, the Second Foreclosure Case was put on hold on November 6, 2018." This is incorrect, the docket of those proceedings, which the Court may take judicial notice of, contains no such "hold" or any motion to stay. In fact, Ocwen thereafter moved to dismiss Freeman's affirmative defense.

14.     Paragraph 23 of Ocwen's Statement of Undisputed Material Facts proclaims "Plaintiff had not submitted any payment that was rejected, returned, or otherwise held without application after the close of her Chapter 13 Bankruptcy." This statement is incorrect. Payment for June of 2018 was expressly rejected. *See* Ocwen_Freeman 003634 [Filing No. 83-2]; Verdooren Dep. 129:18-19 [Filing No. 83-10]. Despite this, Plaintiff submitted payment to Ocwen by check for her monthly payments in July, August, September, October and November 2018. Demona Freeman Dep. 98:6-11 [Filing No.

83-15]. Freeman's payment obligations for June, July, and August of 2018 were satisfied. Patterson Expert Report ¶ 93-95 [Filing No. 83-25]. Freeman's efforts to continue making her monthly payment obligation is corroborated by her husband: "We tried more than once [to make mortgage payments] and they wouldn't do it, period, not just once. We tried to get them to accept it more than once, I know that." *See* Allen Freeman Dep. 29:21-23 [Filing No. 83-23]; *see also* Allen Freeman Dep. 30:1-2 [Filing No. 83-23] ("[T]here are mortgage payments [Ocwen] didn't accept."). Also, other payments following her exit from bankruptcy were held in suspense without application. *See generally* Life of Loan History [Filing No. 83-8] and the Patterson Expert Report ¶ 89 [Filing No. 83-25].

15.    Paragraph 28 of Ocwen's Statement of Undisputed Material Facts also states, "In reality, there is no pending foreclosure action against Plaintiff or the Property, and no foreclosure action was filed against her after the January 23, 2019 dismissal of the Second Foreclosure Case. *See* Verdooren AP Decl. ¶ 28." This is incorrect. While true no foreclosure action has been filed against Freeman after the January 23, 2019 dismissal, there is most certainly a pending foreclosure action. The Loan remains in a manufactured state of default. Ocwen will not accept Freeman's monthly payments. As of December of 2019, Ocwen seeks to collect $44,462.99 from Freeman, an amount far greater than the payments it alleges she has missed. *See* Ocwen_Freeman 004832 [Filing No. 83-4].

16.    Paragraph 29 of Ocwen's Statement of Undisputed Material Facts states, "There is no evidence in the record that any medical professional or treatment provider has diagnosed or concluded that Plaintiff suffers from any condition, including high blood pressure, as a result of the acts and/or omissions of PHH or OFC despite what she alleges in this Adversary Proceeding." This is incorrect. Dr. Newton concluded her condition and

symptoms were in part a product of psychosomatic issues caused by stress related to Ocwen. Newton Dep. 18:21-24 [Filing No. 83-28]; Newton Dep. 32:13-34:5; 34:13-25 [Filing No. 83-29]. Also, there is no evidence in the record that Freeman's high blood pressure could be the result of any other cause besides the acts or omissions of Ocwen or PHH. Freeman has no other financial issues or sources of inordinate stress since completing her bankruptcy and she remains gainfully employed. Freeman Declaration ¶ 20 [Filing No. 83-20]. Freeman has no history of high blood pressure in the family. *Id.* [Filing No. 83-20]. Further, Freeman has exercised regularly and consistently since the time she began experiencing issues with her blood pressure in 2018. Freeman Declaration ¶ 51 [Filing No. 83-20].

17.    Paragraph 30 of Ocwen's Statement of Undisputed Material Facts proclaims "[t]here is no evidence in the record that any medical professional or treatment provider has ever diagnosed or concluded that any physical or mental condition, ailment, and/or symptom purportedly experienced by Plaintiff is a result of the acts and/or omissions of PHH or OFC despite what she alleges in this lawsuit." This is incorrect.[2] Dr. Newton concluded her condition and symptoms were in part a product of psychosomatic issues caused by stress related to Ocwen. Newton Dep. 18:21-24 [Filing No. 83-28]; Newton Dep. 32:13-34:5; 34:13-25 [Filing No. 83-29]. Also, there is no evidence in the record that Freeman's high blood pressure, depression, anxiety, loss of sleep, loss of appetite, and other physical and mental ailments she has claimed to suffer as a result of Ocwen, could be the result of any other cause besides the acts or omissions of Ocwen or PHH. Freeman has no other financial issues or sources of inordinate stress since completing her bankruptcy and she remains

---

[2] This assertion is also entirely irrelevant. *See Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676 (7th Cir. 2011) (rejecting servicer's argument that borrowers' "self-serving" testimony about their emotional distress was insufficient to support an award of damages).

gainfully employed. Freeman Declaration ¶ 20 [Filing No. 83-20]. Freeman has no history of high blood pressure in the family. *Id.* [Filing No. 83-20]. Further, Freeman has exercised regularly and consistently since the time she began experiencing issues with her blood pressure in 2018. Freeman Declaration ¶ 51 [Filing No. 83-20]. Allen also testified Freeman began suffering from loss of sleep only after Ocwen's servicing misconduct began following her discharge from bankruptcy. Allen Freeman Dep. 45:3-11 [Filing No. 83-24].

18.    Paragraph 31 of Ocwen's Statement of Undisputed Material Facts proclaims, "[a]t no point prior to the initiation of the District Court litigation had Plaintiff sought medical or psychological treatment for anxiety, depression, emotional distress, or any other similar mental condition." This is incorrect. Prior to the initiation of the District Court litigation, Freeman sought treatment from Dr. Beard for high-blood pressure induced by stress caused by Ocwen, including during an appointment with Dr. Beard in October of 2018. *See, e.g.*, Freeman Declaration ¶¶ 45-46 [Filing No. 83-20]; Beard Dep. 11:1-7 [Filing No. 83-26]. Further, prior to the initiation of the District Court litigation, Freeman sought treatment from Dr. Newton for neuromusculoskeletal issues caused in part by stress caused by Ocwen. *See, e.g.*, Newton Dep. 18:21-24 [Filing No. 83-28]; Newton Dep. 32:13-34:5 and 34:13-25 [Filing No. 83-29].

19.    Paragraph 35 of Ocwen's Statement of Undisputed Material Facts proclaims "Plaintiff does not know when her alleged sleep troubles began." This is incorrect and a mischaracterization of Freeman's testimony. Freeman clearly testified that she began losing sleep "immediately after" her troubles with Ocwen began. Demona Freeman Dep. 145:11-13 [Filing No. 83-17]. Though she could not recall the exact date, she clearly recalled and testified that her sleeping problems began "immediately after" Ocwen's

misconduct began. *Id.* Freeman has consistently maintained that her sleep loss began promptly after learning immediately after her exit from bankruptcy of Ocwen's errors in servicing her Loan and after Ocwen filed its *Notice of Relief from Stay and Abandonment* on February 21, 2018. *See, e.g.*, Freeman Declaration ¶ 8 [Filing No. 83-20].

20.    Paragraph 36 of Ocwen's Statement of Undisputed Material Facts proclaims "Plaintiff testified that she wakes up every day frustrated because her lawsuits have not ended, but she also acknowledged she caused the litigation." This is incorrect and a mischaracterization of the facts. Though true Freeman testified that she wakes up every day frustrated because the lawsuits have not ended and acknowledged that she initiated the instant litigation, the cause of this litigation is Ocwen's servicing misconduct, including its violations of the discharge injunction.

21.    Paragraph 39 of Ocwen's Statement of Undisputed Material Facts proclaims "Plaintiff testified that if there was no pending foreclosure action, she would not be mentally distressed." This is incorrect and is a misleading portrayal of Plaintiff's testimony.[3] When Freeman testified that she would not be mentally distressed if there were no pending foreclosure action, Freeman misunderstood "foreclosure" to mean a situation in which Ocwen considered her Loan to be in default status. *See* Freeman Declaration ¶ 56 [Filing No. 83-20]. Indeed, as described above, *see supra* Statement of Material Facts in Dispute ("SMFD") ¶ 15, Ocwen has, since Freeman's exit from bankruptcy, and still today considers Freeman's Loan in a state of default. Freeman is caused mental distress by Ocwen

---

[3] In its summary judgment briefing in the District Court litigation filed in April of 2022 [Dkt. 269 at ¶¶ 38-40], Ocwen made these same assertions that Freeman testified if there were no pending foreclosure action, she would not be suffering various damages she alleges. However, as Ocwen was made aware by Freeman's responsive briefing in the District Court litigation [Dkt. 365] and her Declaration in support thereof [Dkt. 336-23], Freeman acknowledged that she had erroneously understood the term "foreclosure" to mean an instance in which Ocwen considered her Loan in default status. Despite Ocwen attempting to again twist Freeman's words and spin that same narrative herein, Freeman reiterates her misunderstanding and misuse of the term "foreclosure" herein. *See* Freeman Declaration ¶ 56 [Filing No. 83-20].

maintaining her Loan in a manufactured state of default. *See* Freeman Declaration ¶ 57 [Filing No. 83-20].

22.    Paragraph 41 of Ocwen's Statement of Undisputed Material Facts proclaims "Plaintiff testified that if there was no pending foreclosure action, her quality of life would improve." This is incorrect and is a misleading portrayal of Plaintiff's testimony. When Freeman testified that her quality of life would improve if there were no pending foreclosure action, Freeman misunderstood "foreclosure" to mean a situation in which Ocwen considered her Loan to be in default status. *See* Freeman Declaration ¶ 56 [Filing No. 83-20]. Indeed, as described above, *see supra* SMFD ¶ 15, Ocwen has, since Freeman's exit from bankruptcy, and still today considers Freeman's Loan in a state of default. Freeman's quality of life would improve if not for Ocwen maintaining her Loan in a manufactured state of default. *See* Freeman Declaration ¶ 57 [Filing No. 83-20].

23.    Paragraph 43 of Ocwen's Statement of Undisputed Material Facts proclaims "Plaintiff testified that if there was no pending foreclosure action, there would be no tension in her relationship with her husband." This is incorrect and is a misleading portrayal of Plaintiff's testimony. When Freeman testified that there would be no tension in her relationship with her husband if there were no pending foreclosure action, Freeman misunderstood "foreclosure" to mean a situation in which Ocwen considered her Loan to be in default status. *See* Freeman Declaration ¶ 56 [Filing No. 83-20]. Indeed, as described above, *see supra* SMFD ¶ 15, Ocwen has, since Freeman's exit from bankruptcy, and still today considers Freeman's Loan in a state of default. Tension in Freeman's relationship with her husband is caused by Ocwen maintaining her Loan in a manufactured state of default. *See* Freeman Declaration ¶ 57 [Filing No. 83-20].

24.     Paragraph 47 of Ocwen's Statement of Undisputed Material Facts proclaims "Plaintiff testified that she could not remember whether anything in the Response to Purported NOE No. 5 caused her any damages or stress." This is a misleading portrayal of Freeman's testimony. Though true she testified that she could not immediately remember how the Response to NOE No. 5 caused her damages or stress, she specifically testified that she needed to review such Response again, in order to refresh her recollection. Demona Freeman Bankr. Dep. 101:22-102:1[Filing No. 83-42]. Upon further review of Ocwen's Response to NOE No. 5 and further contemplation, Freeman recalls feeling stress, anxiety, and frustration. *See* Freeman Declaration ¶ 41 [Filing No. 83-20]. Ocwen's Response to NOE No. 5 caused Freeman to feel extremely hopeless that Ocwen would correct its mistakes, remove her Loan from being in a manufactured state of default, and allow her to resume making her monthly payments. *See id.* [Filing No. 83-20].

25.     Paragraph 53 of Ocwen's Statement of Undisputed Material Facts proclaims "Plaintiff testified that she suffered an alleged injury to reputation as her neighbors asking her if everything was okay was actually a question regarding her finances. Plaintiff further testified that this allegation is based on her knowledge of what other people are thinking as she can read peoples' minds." (internal citations omitted). This is disingenuous and one of many attempts by Ocwen to characterize Freeman as "crazy" or a bad actor. During Freeman's bankruptcy deposition, when being questioned about her interactions with her neighbor (who Freeman feared was aware of Ocwen's attempts to foreclosure on her home and was, therefore, afraid such neighbor would think less of Freeman as if she caused the foreclosure by being financially irresponsible), Ocwen's counsel antagonistically asked if the reason Freeman thought her neighbors were judging her was because she could "read

minds." Demona Freeman Bankr. Dep. 144:1-5 [Filing No. 58-11]. Surprised at such a preposterous question, and understandably frustrated by the continuous belittling and manipulation, Freeman sarcastically responded "Uh-huh. Yeah." *Id.* [Filing No. 58-11]; *see also* Freeman Declaration ¶ 28 [Filing No. 83-20]. Freeman of course does not actually believe, and has never believed, she was capable of reading people's minds.

26.    Paragraph 57 of Ocwen's Statement of Undisputed Material Facts proclaims "With the exception of one payment made in August 2019[4], Plaintiff has not made a mortgage payment on the Loan since May 2018 - a total of fifty (50) months without a payment." This is incorrect. First, Ocwen began rejecting Freeman's payments in June of 2018. Demona Freeman Dep. 98:6-11 [Filing No. 83-15]; Verdooren Dep. 129:18-19 [Filing No. 83-10]. Freeman attempted to make payments to Ocwen on a monthly basis between June 2018, when Ocwen began rejecting her payments, and November 2018. Demona Freeman Dep. 98:6-11 [Filing No. 83-15]. Second, as a matter of policy Ocwen will not accept single monthly payments on a loan it considers to be in default. Verdooren Dep. 129:18-19 [Filing No. 83-10]; *see also* Ocwen_Freeman004907 [Filing No. 83-4]. Instead, Ocwen will only accept payment of the "full reinstatement amount." Verdooren Dep. 129:1-19, and 129:20-131:12 [Filing No. 83-10]. Regarding the "one payment made in

---

[4] In his deposition, Verdooren testified that he was "still in the process of researching this. I haven't gotten a definitive answer. There was one payment that was accepted in August of 2019. I don't know the – where that payment came from, but it was applied to the loan, or to the account….I'm still researching this topic. ***That's the only payment I've seen that's come in. Since June of 2018, there was one payment applied to the account in August of 2019.***" (Emphasis added).  Verdooren Dep. 145:7-16 [Filing No. 83-11]. In preparation of his Declaration, Verdooren stated that he "reviewed the Rule 30(b)(6) deposition testimony given by myself as a corporate representative on behalf of Ocwen on March 23, 2022." *See* Verdooren Decl. ¶ 7 [Filing No. 272-1]. In paragraph 22 of his Declaration, Verdooren states that "Ocwen informed Plaintiff in a June 2018 phone call that it would only accept a full reinstatement payment as opposed to a regular monthly payment. Regardless, Plaintiff did not submit any payment at all to Ocwen in June 2018. Ocwen also did not receive any payments between July 2018 and December 2018. ***With the exception of one payment made in August 2019***, Plaintiff has not made a mortgage payment on the Loan since May 2018…." Verdooren Decl. ¶ 22 [Filing No. 272-1] (emphasis added).

August 2019," Ocwen's own research of its records fails to indicate when that payment (applied to the August 1, 2018 payment due) was actually received. *See supra* fn.4.

27.     Paragraph 58 of Ocwen's Statement of Undisputed Material Facts states, "[a] payoff quote provided to Plaintiff on August 7, 2019 shows that none of the disallowed fees, fees associated with the Second Foreclosure Case, or late charges were being sought from Plaintiff several months after servicing transferred to PHH." While true this is what the payoff quote says, this is otherwise incorrect. On September 26, 2019, Ocwen directed money received from Freeman to compensate itself for fees and costs totaling $299.43. *See* Ocwen_Freeman004832 [Filing No. 83-4].  As of December 31, 2019, PHH was seeking fees and costs totaling $44,462.89 as set forth in its advance balance. *Id.* [Filing No. 83-4].

28.     Paragraph 59 of Ocwen's Statement of Undisputed Material Facts proclaims "[o]n June 17, 2020, PHH received funds in the amount of $3,443.73 related to an insurance claim for Plaintiff's roof. Those funds have not been disbursed due to the delinquency on the Loan. The insurance funds are not being withheld as a result of litigation. The funds are not being withheld as a result of any of the long-removed disallowed amounts from Plaintiff's Bankruptcy." This statement of "fact", assertion that Ocwen may withhold insurance proceeds for to-be-performed repairs, is nonsensical, wholly unsupported by the record, and in contradiction with both the terms of the Mortgage and the insurers intent in approving the claim.

### IV. STATEMENT OF ADDITIONAL FACTS NOT IN DISPUTE

1.     On April 23, 2012, Freeman filed a bankruptcy case pursuant to Chapter 13 of the United States Bankruptcy Code on April 23, 2012 in this Court (hereinafter the "Bankruptcy Case"). Ocwen appeared in the Bankruptcy Case and participated in those

proceedings by filing a *Proof of Claim* (Claim No. 8 dated July 26, 2012) [Claim Filing No. 8-1] on behalf of The Bank of New York Mellon.

2.      On September 13, 2012, the United States Trustee filed an *Objection to Claim* [Filing No. 47] detailing approximately three pages of errors in Ocwen's Proof of Claim including unsubstantiated, and thus objectionable, charges contained within.[5]

3.      Ocwen did not respond to the *Objection to Claim*.

4.      On October 26, 2012, the Bankruptcy Court entered the *Order On United States Trustee's Objection To Claim Number 8 Filed by Ocwen Loan Servicing, LLC.* [Filing No. 53] disallowing the objected to, and unsubstantiated, fees, expenses, and charges totaling $10,289.84 as well as any fees for preparation of the Proof of Claim or amendments thereto the Loan.

5.      On November 13, 2013, despite its failure to respond to the *Objection to Claim*, Ocwen filed a *Motion to Reconsider* [Filing No. 57]. On December 5, 2012, the United States Trustee filed her *Objection to the Motion to Reconsider* [Filing No. 59].

6.      On January 22, 2013, the Court entered an Order [Filing No. 69] denying Ocwen's *Motion to Reconsider*.

7.      On February 22, 2013, undeterred from seeking to collect monies it was not entitled to, Ocwen filed a *Notice of Postpetition Fees, Expenses and Charges* [Filing No. doc] under Claim Number 8 on the Claims Register ("Fee Notice") to supplement the portion of its  *Proof of Claim* not specifically disallowed. Within the Fee Notice, Ocwen listed a "Bankruptcy Fee" dated January 17, 2013, in the amount of $300.00. Attached to the

---

[5] Within the Objection to Claim, the United States Trustee also states: "Further, based on a review of claims filed by Ocwen Loan Servicing, LLC. in the Southern District of Indiana, the United States Trustee believes this failure occurs in nearly *every* proof of claim filed by Ocwen and is systematic in nature." (Emphasis added).

Fee Notice was an invoice which provided further detail regarding the "Bankruptcy Fee." The invoice indicates the fee (which was to be assessed to Freeman's account) related to a "Response to Objection to Claim – (Rec from Brwr)."

8.    As set forth above, Ocwen **did not** file a response to the Trustee's Objection to Claim.

9.    In response, the United States Trustee filed a *Motion For Determination* [Filing No. 80] stating: "12. A review of the case docket indicates that [Ocwen] failed to respond to the Claim Objection. Thus any fees for a Response to Objection to Proof of Claim" are improper and should be disallowed entirely."

10.    Just as it did not respond to the Trustee's *Objection to Claim*, Ocwen did not respond to the *Motion for Determination*. Despite this, the Court set the *Motion for Determination* for hearing and provided formal notice to Ocwen of the same. Nonetheless, Ocwen failed to attend the hearing.

11.    On April 8, 2013, the Court entered an Order  [Filing No. 85] granting the *Motion for Determination*.

12.    On April 12, 2017, the Chapter 13 Trustee filed a Notice of Final Cure Payment [Filing No. 109] pursuant to FRBP § 3002.1(f) stating the amount to cure the prepetition default ($12,378.19 in arrearage) had been paid in full and that Freeman had completed all payments required under the plan.

13.    On April 24, 2017, Ocwen filed a *Response to Notice of Final Cure Payment* [Filing No. doc] "[agreeing] that the Debtor(s) have paid in full the amount required to cure the prepetition default on the creditor's claim." Within the same document, under the penalties for perjury, Ocwen affirmed Freeman was current with all post-petition payments

27

consistent with §1322(b)(5) of the Bankruptcy Code including all fees, charges, expenses, escrow, and costs. *Id.* [Filing No. doc]. Further, Ocwen affirmed therein that the next post-petition payment from Freeman was due on May 1, 2017. *Id.* [Filing No. doc]. Ocwen made all these affirmations despite the fact that, at the time it filed its *Response to Notice of Final Cure Payment*, its internal records erroneously reflected Freeman was eight months delinquent. *See* Patterson Expert Report ¶ 27(a) [Filing No. 83-25].

14.     On November 21, 2017, Freeman obtained an Order of Discharge [Filing No. 132].

15.     Beginning in May of 2017, Freeman commenced making timely and adequate monthly installment payments on the Loan to Ocwen. *See* Ocwen_Freeman 003511 [Filing No. 83-2]. Thereafter, she continued to make timely and adequate payments every month until Ocwen started rejecting them in June of 2018.

16.     On November 21, 2017, the very same day the Court entered the Order of Discharge, Ocwen's records reflected the loan as being nine (9) payments delinquent. *See* Patterson Expert Report ¶ 28(a) [Filing No. 83-25].

17.     On January 7, 2018, Ocwen reported the Loan to the Credit Bureaus as 180+ days delinquent and with a past due balance of $9,109. *See* Ocwen_Freeman 003568 [Filing No. 84-3]. The Loan was not in fact delinquent and had no past due balance. *See* Patterson Expert Report, ¶¶ 89-90 [Filing No. 86-26].

18.     On January 21, 2018, Freeman applied for but was denied a loan from OneMain Financial Services, Inc. in the amount of $10,000.00. *See* OneMain Nonparty Responses 000548 [Filing No. 83-33]. At that time, Ocwen was the only creditor Freeman had reporting to the Credit Bureaus that her account with them was delinquent. Freeman

Declaration ¶ 34 [Filing No. 83-20]. At that time, Freeman was current on all of her outstanding payment obligations. *Id.* [Filing No. 83-20].

19.     On February 21, 2018, Ocwen directed the filing of a Notice of Relief from Stay and Abandonment ("Notice of Relief") in Cause No. 29D01-0904-MF-000484, asserting the property at issue had been abandoned and that it was "permitted to proceed with this foreclosure action." [Filing No. 83-34].

20.     On February 21, 2018, the Loan was current and Ocwen had no right to "proceed with [the] foreclosure action." *See* Patterson Expert Report, ¶¶ 90, 91 [Filing No. 83-25].

21.     On February 28, 2018, Freeman contacted Ocwen to inquire about a copy of the Notice of Relief she had received. *See* Ocwen_Freeman 003593 [Filing No. 83-2]. Ocwen denied sending the documents, advised she should contact her bankruptcy attorney about payments she had missed, and informed her the Loan was 119 days past due. *Id.* [Filing No. 83-2].[6]

22.     On April 1, 2018, despite a previous request for the collateral file to initiate its pre-foreclosure processes, Ocwen's system of record still believed the Loan was in an active bankruptcy. *See* Ocwen_Freeman 003610 [Filing No. 83-2]. Yet Ocwen continued to report the Loan as being severely delinquent and sending collection letters to Freeman. *See, e.g.,* [Filing No. 83-38] and [Filing No. 83-40].

23.     On May 25, 2018, Ocwen concluded Freeman's Loan was in default because "...payments [for] 11/15, 1/16, 3/16, 9/16, 3/17 were not made…" *See* Ocwen_Freeman 003627 [Filing No. 83-2]. Ocwen acknowledged that each of these payments occurred

---

[6] Despite this representation, only three weeks prior, Ocwen reported the Loan to the Credit Bureaus as being past due in the amount of $9,190. *See* Ocwen_Freeman 003572 [Filing No. 83-2]. The Loan was not in fact delinquent and had no past due balance. *See* Patterson Expert Report ¶ 90 [Filing No. 83-25].

before the Rule 3002.1 Notice of Final Cure was filed by the Trustee and that Ocwen nevertheless responded to it by asserting that Freeman had paid all amounts due and owing. *See* Verdooren Dep. 112:10-25 [Filing No. 83-9].

24.    On May 26, 2018, Freeman contacted Ocwen to dispute the status of the Loan and relayed her understanding that her account should be current. *See* Ocwen_Freeman 003629 [Filing No. 83-2]. The call was escalated to a supervisor. *Id*. [Filing No. 83-2]. The supervisor "let her know that the plan may have been satisfied but not the entire delinquency…the next payment due is 1/1/2018. The total amount past due is $3,793.29." *Id*. [Filing No. 83-2]. The supervisor then referred Freeman to her bankruptcy attorney. *Id*. [Filing No. 83-2]. Ocwen had no explanation for this false statement. *See* Verdooren Dep. 115:12-118:22 [Filing No. 83-9].

25.    On June 4, 2018, Ocwen self-identified it had been misapplying funds received from Freeman during the course of her bankruptcy. *See* Ocwen_Freeman 003632 [Filing No. 83-2].

26.    On June 8, 2018, Ocwen began rejecting Freeman's payments. *See* Ocwen_Freeman 003634 [Filing No. 83-2]; and Freeman Declaration  ¶ 54 [Filing No. 83-20]. Ocwen rejected Freeman's payment because it mistakenly deemed the Loan to be in default. *See*  Verdooren Dep. 129:14-19 [Filing No. 83-10].

27.    Ocwen will not accept a single monthly payment, only the entire amount it believes has been unpaid, towards a loan it has deemed to be in default. Verdooren Dep. 129:8-9 [Filing No. 83-10]; *see also* Ocwen_Freeman 004907 [Filing No. 83-4]. Despite this, Freeman continued submitting payments to Ocwen by check through November of 2018. *See* Demona Freeman Dep. 98:6-11 [Filing No.83-15].

28.     On August 15, 2018, Ocwen directed the filing of a Complaint for Foreclosure in the Hamilton County Superior Court under Cause No. 29D03-1808-MF-007526 ("Second Foreclosure Action"). [Filing No. 84-12].

29.     Even after Ocwen began rejecting and refusing to apply payments in June of 2018, the Loan was not in default (90+ days delinquent) on August 15, 2018. *See* Patterson Expert Report ¶ 93 [Filing No. 83-25].

30.     On October 17, 2018, Freeman applied for a loan from OneMain Financial Services, Inc. to fix her transmission. *See* OneMain Nonparty Responses 000544 [Filing No. 83-33]. This application was denied. *See* Freeman Declaration ¶ 34 [Filing No. 83-20]. At that time, Ocwen was reporting the Loan to the Credit Bureaus as being 180+ days delinquent with a past due balance of $8,161.00. *See* Ocwen_Freeman 003719 [Filing No. 83-2].

31.     On January 3, 2019, Ocwen waived the previously assessed foreclosure costs and fees. However, on January 8, 2019, Ocwen reassessed those foreclosure costs and fees to the Loan. *See* Patterson Expert Report ¶¶ 83 and 97 [Filing No. 83-25]. Those fees and costs, as well others, remain.

32.     On January 11, 2019, despite having full and specific knowledge it initiated foreclosure in error, Ocwen filed a Motion to Dismiss Freeman's affirmative defenses wherein she alleged the same. [Filing No. 83-37].

33.     On February 1, 2019,  Ocwen continued to treat the Loan as if the Order of Discharge had not been entered and was awaiting bankruptcy reconciliation. Ocwen_Freeman 004890 [Filing No. 83-4]; Ocwen_Freeman 004881 [Filing No. 83-4].

34.     From December 1, 2017 to December 6, 2018 (the date the District Court cause of action was filed), Ocwen sought to collect $2,341.81 in new fees and costs unrelated to any "disallowed amounts." In addition, Ocwen assessed $1,370.36 in previously waived fees and costs. Patterson Expert Report ¶ 74-75 and 82-83 [Filing No. 83-25].

35.     Despite Ocwen's contention it provided Freeman with an escrow refund in the amount of $1,839.46, *see* 83-4 to Freeman Declaration [Filing No. 83-20], Freeman has never received any escrow refund from Ocwen. *See* Freeman Declaration ¶ 52 [Filing No. 83-20].

36.     Ocwen continues to assess improper fees and costs to the Loan in the form of an advance balance. As of December 31, 2019, this advance balance was $44,462.89. Ocwen_Freeman004832 [Filing No. 83-4].

37.     From June of 2018 to today, Ocwen has never provided any indication Freeman could recommence making her monthly mortgage payments. Freeman Declaration ¶ 54 [Filing No. 83-20].

38.     After exiting her bankruptcy at the end of 2017 and realizing within just a couple of months that Ocwen had committed the aforementioned errors in servicing her Loan such that it was holding her Loan in a manufactured state of default, Freeman made numerous efforts to contact Ocwen to have it correct its errors or otherwise made efforts to dispute Ocwen's errors prior to ultimately filing the District Court litigation, including but not limited to: three separate credit disputes (*see* [Filing No. Filing No. 83-32], Ocwen_Freeman 004006 and 004009 [Filing No. 83-5]), sending three Notices of Error[7]

---

[7] After filing the District Court litigation, and because Ocwen had failed to appropriate respond to Freeman's first three Notices of Error and her first Request for Information, she ultimately sent two more Notices of Error and *** Requests for Information.

(*see* [Filing No. 83-13], [Filing No. 83-16], and [Filing No. 83-18]), sending a Request for Information (*see* [Filing No. 83-12]), and numerous phone calls to Ocwen (*see* Ocwen_Freeman 003593, 003613, 003620, 003628-29, 003634, 003636, and 003701 [Filing No. 83-2]. *See also* Freeman Declaration ¶ 39 [Filing No. 83-20].

39.     Ocwen has long known of its failure to adhere to the requirements of Chapter 13 bankruptcies. Ocwen tracked these "risk areas" in spreadsheets it refers to as Risk Convergence Reports ("RCRs"). The RCRs are produced monthly and track risk items by an issue number and issue name. *See, e.g,*  Ocwen_Freeman 006925, attached to Appendix as *Exhibit F* **(sealed)**.

40.     The RCRs identify numerous long standing systemic issues relevant to every aspect of  Ocwen's  handling of Freeman's mortgage loan account. There is nothing in the evidentiary record to suggest these "risk areas" were ever resolved by Ocwen before it ceased to utilize RealServicing in mid 2019.[8] The "risk areas" include *without limitation* those pertaining to inconsistencies in payment application used by cashiering on BK loans (*see* Ocwen_Freeman 006925, attached to Appendix as *Exhibit F*) **(sealed)**; inaccurate post-discharge credit reporting (*see* Ocwen_Freeman 006925, attached to Appendix as *Exhibit F*) **(sealed)**;  and flags being raised to prevent the collection of a single payment or full reinstatement   (*see* Ocwen_Freeman0006925, attached to Appendix as *Exhibit F*) **(sealed)**.

41.     In March of 2015, Goldin Associates, LLC. ("Goldin") was appointed Operations Monitor. The purview of the Operations Monitor extended "to all matters directly affecting New York borrowers, including matters that affect borrowers in all states

---

[8] The RCRs also include a detailed description of the source of these risk areas. Contrary to Ocwen's assertion that "human error" was the cause of the issues plaguing Freeman's loan, the RCRs contain numerous findings pointing to deficient programing associated with REALServicing as the culprit.

or in multiple states…" Thereafter, Goldin prepared reports ("Goldin Reports") that identify deficiencies in Ocwen's servicing operations, many in relation to its service of loans in a Chapter 13 bankruptcy, and detailing recommended corrective measures. A true and accurate copy of the fourth Goldin Report is attached hereto as Ocwen_Freeman 011045-011203, attached to Appendix as ***Exhibit G* (sealed)**.

42.    One of the many issues discussed in the Goldin Reports pertains to inaccuracies about amounts claimed to be due and the handling of loans involved in Chapter 13 bankruptcy proceedings including without limitation failure to adhere to 11 U.S.C. § 524, *et seq*. *See* Ocwen_Freeman 009579, attached to Appendix as ***Exhibit G* (sealed)**; Ocwen_Freeman 010728, attached to Appendix as ***Exhibit G* (sealed)**; Ocwen_Freeman 009894, attached to Appendix as ***Exhibit G* (sealed)**; Ocwen_Freeman 009897, attached to Appendix as ***Exhibit G* (sealed)**.

## V. ARGUMENT

**A.  Freeman has Appropriately Sought Relief in Accordance with the Court's Inherent Contempt Powers and Those Provided Under 11 U.S.C. § 105.**

Ocwen claims it is entitled to summary judgment "because there is no private right of action under 11 U.S.C. § 524." [Dkt. 56 at 19]. However, Freeman does not pursue a "private right of action" but rather relief in accordance with the Court's contempt powers and those provided under § 105.[9] *See Taggart v. Lorenzen*, \_\_\_ U.S. \_\_\_, 139 S. Ct. 1795, 204 L. Ed. 2d 129 (2019) (bankruptcy court can find an entity in contempt of court for

---

[9] "Federal courts possess certain inherent powers, not conferred by rule or statute, to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Goodyear Tire & Rubber Co. v. Haeger*, \_\_\_ U.S. \_\_\_, 137 S.Ct. 1178, 1186, 197 L.Ed.2d 585 (2017). As such, "[a] federal court also possesses the inherent power to regulate litigants' behavior and to sanction a litigant for bad-faith conduct." *In re Weiss*, 111 F.3d 1159, 1171 (4th Cir. 1997) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)).This inherent power to sanction litigants for bad-faith conduct applies to bankruptcy courts in addition to Article III courts. *See In re Weiss*, 111 F.3d at 1171–72.

violating the discharge injunction under the grant of equitable powers in § 105); *see also In re Chicor Life Ctr., LC*, 553 B.R. 61 (Bankr. D. S.C. 2016) (citing *Fisher v. Apostolou*, 155 F. 3d 876 (7th Cir. 1998) ("The provisions of the Bankruptcy Code, including the equitable powers of the bankruptcy court under Section 105, are designed to protect the public interest."); *Marrama v. Citizens Bank of Mass.*, 127 S.Ct. 1105, 1111-12, 549 U.S. 365, 166 L.Ed.2d 956 (2007) (Bankruptcy courts have "broad authority … to take any action that is necessary or appropriate 'to prevent an abuse of process' described in § 105(a) of the Code."); *Campbell v. Countrywide Home Loans, Inc.*, 545 F.3d 348, 356 n.1 (5th Cir. 2008) (stating that the bankruptcy court may use § 105 to impose sanctions on parties who may attempt to abuse the procedural mechanisms within the bankruptcy court); *In re Earl*, 140 B.R. 728, 741 (Bankr. N.D. Ind. 1992) (using § 105(a) where the "Court must preserve the integrity of the Bankruptcy system and prevent the abusive use of the Bankruptcy system…").

As for Ocwen's argument the Court may only provide relief to Freeman via a motion for contempt and that Freeman improperly initiated this matter via an adversary proceeding, it is a "red herring" that unsurprisingly seeks to impose a superficial formality upon the manner in which a debtor seeks relief. *See, e.g.*, *In re Cano*, 410 B.R. 506, 537 (Bankr. S.D. Tex. 2009); *In re Anderson*, 550 B.R. 228, 239 (S.D.N.Y. Feb. 22, 2016) (also calling the painting of a debtor's request for relief as an attempt to bring a private right of action a red herring); *Motichko v. Premium Asset Recovery, Inc. (In re Motichko)*, 395 B.R. 25 (Bankr.N.D.Ohio 2008) (concluding that requiring a debtor to refile a complaint in an adversary proceeding that sought, as motion, to hold a creditor in contempt, would be "unnecessary 'hoop jumping'" that would only increase litigation costs without providing

any benefit to the parties). To be certain, this Court and numerous other bankruptcy courts have permitted borrowers to invoke their inherent and Section 105 powers in an adversary proceeding rather than via motion. *See, e.g.*, *In re Wilson*, 2011 WL 6887729 (Bankr. S.D. Ind., Dec. 28, 2011) (denying summary judgment, setting Plaintiff's Complaint Seeking Damages in Non–Core Adversary Proceeding for Violation of the Discharge Injunction for trial); *In re Sterling*, 2013 Bankr. LEXIS 542 (Bankr. N.D. Ind. Jan. 31, 2013) (adversary proceeding permitted); *In re Alley*, No. 09-21500, 2014 WL 2987656 (Bankr. D. Me. July 1, 2014); *Motichko v. Premium Asset Recovery, Inc. (In re Motichko)*, 395 B.R. 25 (Bankr. N.D. Ohio 2008); *Montano v. First Light Federal Credit Union* (In re Montano), 398 B.R. 47, 55 (Bankr. D.N.M. 2008); The Seventh Circuit has done the same. *See In re Sterling*, 933 F.3d 828 (7th Cir. 2019).

In *Motichko*, the court found that while the adversary complaint did not specifically seek to have the defendant held in contempt, it was entirely sufficient for this purpose because it contained allegations of conduct establishing a right to relief. In so holding, the court specifically declined to elevate form over substance or, as referenced above, require the debtors to engage in "unnecessary 'hoop jumping[.]'" In fact, the court explained that an adversary proceeding provided more procedural protection to a defendant and a contempt motion could be handled in the same manner as an adversary proceeding. *Motichko*, 395 B.R. at 33.

This dilatory "hoop jumping" is precisely what Ocwen pursues here while simultaneously asking the Court to ignore that "Section 11 U.S.C. 105(a) gives broad authority to bankruptcy courts to issue *any* order necessary…to carry out the provisions of the bankruptcy code." *In re Harlow v. Wells Fargo & Co.*, No. 17-71487, 2022 WL

17586716, at *11 n.11 (Bankr. W.D. Va. Dec. 12, 2022) (citing *In Re Golden*, 630 B.R. 896 (Bankr. E.D. N.Y. 2021 and expressly rejecting the arguments raised by Ocwen). In turn, the Bankruptcy Code, both in general structure and in specific provisions, has been uniformly interpreted to "authorize bankruptcy courts to prevent the use of the bankruptcy process to achieve illicit objectives." *In re Rodriguez*, 396 B.R. 436, 457-460 (Bankr. S.D. Tex. 2008) (analyzing the court's inherent and statutory powers to grant relief and remedy abuse of process under 11 U.S.C. § 105 and finding that the court may grant plaintiffs a broad range of remedies, including any damage remedy available in a private cause of action). For these reasons, Ocwen's Motion for Summary Judgment should be denied; alternatively, should the Court be inclined to extend a formal requirement or limitation in that it will only utilize its inherent and 105(a) powers via motion, it should grant leave to Freeman to restyle her request for relief in accordance therewith.

**B.  As There is no Fair Ground of Doubt that the Order of Discharge Barred its Conduct, Ocwen Should be Held in Contempt.**

Together, Sections 524(a)(2) and 105(a) "authorize a court to impose civil contempt sanctions [for attempting to collect a discharged debt] when there is no objectively reasonable basis for concluding that the creditor's conduct might be lawful under the discharge order." *Taggart*, 139 S. Ct. at 1801. In this way, "a court may hold a creditor in civil contempt for violating a discharge order if there is no fair ground of doubt as to whether the order barred the creditor's conduct." *Id*. at 1799. This standard is generally an objective one. A party's subjective belief that she was complying with an order ordinarily will not insulate her from civil contempt if that belief was objectively unreasonable. *Id.*

1. <u>Ocwen received notice of the Order of Discharge, and it was clear and unambiguous</u>.

There is no question of material fact that Ocwen received notice of the Order of Discharge and understood its implication. The Court entered Freeman's Order of Discharge on November 21, 2017. [Filing No. 132].  A certificate of service showing that both BONY and Ocwen received service and notice of the Discharge Order was subsequently filed on November 23, 2017. [Filing No. 133]. In addition to the foregoing, Ocwen also received notice of the Order of Discharge internally via its Banko system. Verdooren Bankr. Dep. 12:6-18 [Filing No. 83-6]. Immediately thereafter, the Order of Discharge was notated on Ocwen's notes log and, as a result, it was visible to all of its employees who reviewed the account history. Verdooren Bankr. Dep. 8:17-25; 9:1-14 [Filing No. 83-6]. Likewise, the Order of Discharge, and the obligations flowing therefrom, could not be more unambiguous and were plainly understood by Ocwen, a sophisticated creditor familiar with the bankruptcy process and such orders. Unlike the case of unknown third-party tort victims that were not part of the plan confirmation, Ocwen was a party to Freeman's bankruptcy proceedings from the onset and services thousands of mortgage loans involved in other Chapter 13 bankruptcy proceedings every year. *See, e.g., Zerand-Bernal Grp., Inc., v. Cox, 23 F.3d 159, 163 (7th Cir. 1994)*.

2. Ocwen was not "merely seeking to enforce its lien."

Despite having notice of the Order of Discharge, and fully understanding its responsibilities following its entry, Ocwen contends there is no question of material fact it was "merely seeking to enforce its lien" as opposed to seeking to collect amounts rooted in its servicing errors from Freeman personally. This argument is patently frivolous and independently warrants the entry of sanctions. The the contents of the *Notice of Relief from*

*Stay and Abandonment* Ocwen directed to be filed,[10] its act of initiation a second foreclosure action less than 90 days from the date it began rejecting Freeman's payments, and the contents of the *Complaint on Promissory Note and to Foreclose Mortgage* it directed to be filed therein, unequivocally establishes Ocwen was seeking a personal judgment and precludes it from arguing that Section 524(j) has any application.[11] *See In re Dewitt*, 644 B.R. 385 (Bankr. S.D. Oh. 2022). In addition, as set forth in detail below, mere enforcement of a lien does not entail collection calls, derogatory credit reporting, the placement of door tags, or dunning letters, all of which objectively intended to "pressure a debtor to repay a discharged debt" like what Ocwen did here. *See, e.g. In re Ramos*, 2013 WL 5461859 (Bankr. S.D.N.Y. Oct. 1, 2013) (to avoid contempt finding, lender's communications with debtor must clearly and conspicuously state that lender is enforcing rights as lienholder rather than engaging in collection activity in respect of an *in personam* debt).

> 3. <u>At a minimum, there is a fair ground of doubt as to whether Ocwen sought to collect discharged amounts in violation of 11 U.S.C. § 524.</u>

Having determined that Ocwen had notice of the Order of Discharge, the Court must determine whether there is any objectively reasonable basis for concluding Ocwen's conduct was not in violation of the discharge injunction resulting therefrom. Ocwen contends it did not seek to collect discharged amounts (perhaps only disallowed amounts). This argument, reliant on a self-serving characterization of the amounts Ocwen sought to collect post

---

[10]   The Notice of Relief from Stay and Abandonment reads: "As the automatic stay is no longer in effect and the property has been abandoned, Plaintiff is permitted ***to proceed with this foreclosure action***." (emphasis added). In turn, in that foreclosure action, Ocwen previously obtained a default judgment (including personal judgment) against Freeman on February 9, 2010.

[11]   Specifically, Paragraph 15 reads:  "15. That Plaintiff ***be awarded judgment personally against*** Demona A. Freeman, AKA Demona Ann Freeman, AKA Demona Freeman in the principal amount of $88,039.35 together with all accrued interest thereon as provided in the note and together with all late charges, expenses, advances and other amounts due and owing thereunder, including reasonable attorney fees and the costs of this action." (emphasis added)

discharge, ignores the language of 524(i) as well as the other fees and costs it created that resulted in the Loan's manufactured default.

Moreover, what Ocwen hopes the Court will overlook is that all other amounts, any monies claimed to be owed that relate to pre-petition arrears or were not accounted for under the confirmed plan, *were* discharged. *See, e.g.*, *In re Taylor*, 2012 WL 1808858 (Bankr. S.D. Ind. May 17, 2012) (violation of discharge injunction may occur if creditor attempts to collect additional sums that were owed pre-petition). This includes without limitation "disallowed amounts" and is why Courts routinely find discharge violations "co-existing" among Rule 3002.1 violations - misapplying monies contrary to the confirmed Chapter 13 plan causes post-discharge "past due" balances. *See, e.g. Figueroa*, Nos. 09-07725 (MCF), 19-00032, 2021 WL 5815641, at *6 (finding that a mortgage creditor violated the discharge injunction when it failed to appropriately respond to a Notice of Final Cure Payment and misapplied mortgage payments during and immediately following the conclusion of the bankruptcy); *see also In re Ogen*, 532 B.R. 329 (Bankr. D. Co. 2014); *In re Salazar*, 2016 WL 6068819 (Bankr. S.D. Tx. 2016)*; In re Trevino*, 535 B.R. 110 (Bankr. S.D. Tx. 2015).

> i. *There is no fair ground of doubt as to whether Ocwen's payment misapplications, efforts to collect amounts stemming therefrom, were in violation of 11 U.S.C. § 524.*

Ocwen argues that because the mortgage was not discharged, and it only sought to collect "disallowed" amounts, its post-discharge collection activities did not violate 11 U.S.C. § 524. In addition to being largely false (it sought funds in addition to those disallowed amounts, including those it had placed in suspense), there is no objectively reasonable basis for concluding Ocwen's payment misapplications during and after

Freeman's bankruptcy, and its efforts to collect monies stemming from those misapplications, were anything but a knowing violation of Section 524(i):

> The willful failure of a creditor to credit payments received under a plan confirmed under this title, unless the order confirming the plan is revoked, the plan is in default, or the creditor has not received payments required to be made under the plan in the manner required by the plan (including crediting the amounts required under the plan), *shall constitute a violation of an injunction under subsection (a)(2)* if the act of the creditor to collect and failure to credit payments in the manner required by the plan caused material injury to the debtor.

11. U.S.C. § 524(i) (emphasis added).

Here, at a minimum, the record irrefutably establishes that Ocwen: (a) self-identified it had been misapplying funds received from Freeman during the duration of her bankruptcy (*see* Ocwen_Freeman 003632 [Filing No. 83-2]); (b) assessed and misapplied funds to fees and charges not provided for in her confirmed Chapter 13 plan nor approved by the Court thereafter (*see* Verdooren Bankr. Dep. 22:4-11) [Filing No. 83-6]); and (c) misapplied funds received from Freeman during the duration of her bankruptcy towards a "pre-suspense" account instead of as required by her confirmed Chapter 13 plan (*see* Verdooren Bankr. Dep. 40:24-25; 41:1-13 [Filing No. 83-6]), which each in turn constitute violations of 11 U.S.C. § 524 *et seq*. It matters not whether the mortgage loan itself was discharged. *In re Ridley, 572 B.R. 352 (Bankr. E.D. Okla. 2017)* (discharge of mortgage loan is not required because § 524(i) is intended to enforce plan provisions); *see also Arrington v. Ocwen Loan Servicing, L.L.C. (In re Arrington), 2017 WL 4271085*; *In re Swink, 2021 WL 4768091 (Bankr. M.D.N.C. Oct. 12, 2021)* (§ 524(i) is intended to apply to long-term debts that are not discharged at end of plan); *Williams v. CitiFinancial Servicing L.L.C. (In re Williams), 612 B.R. 682 (Bankr. M.D.N.C. 2020)* (misapplication of payments

violated both § 524 and § 362); *In re Ferris*, 611 B.R. 701 (Bankr. M.D. Fla. 2019) (both transferor and transferee servicers willfully failed to properly credit plan payments).

> ii. *There is no fair ground of doubt as to whether Ocwen's foreclosure filings were in violation of 11 U.S.C. § 524 and did not merely seek to enforce its lien.*

As noted above, Ocwen's *Notice of Relief from Stay and Abandonment*, filed on February 21, 2018 in Cause No. 29D01-0904-MF-000484 [Filing No. 83-34], was in violation of § 524 and did not "merely seek to enforce its lien." In addition to containing material false representations that evidence bad faith (e.g., the property was clearly not "abandoned from the bankruptcy estate", as alleged by Ocwen therein), the filing represents the "continuation" of a foreclosure action that predated Freeman's bankruptcy filing and sought a money judgment.[12] *See In re Harbour Oaks Dev. Corp.*, 228 B.R. 801 (Bankr. M.D. Fla. 1999) ("continuation of foreclosure action" was in violation of discharge injunction, creditor held in contempt); *see also In re Jones*, 2012 WL 5385682 (Bankr. E.D. Ky. Nov. 2, 2012) (foreclosure action violated discharge injunction insofar as it also sought money judgment); *In re Rizzo-Cheverier*, 364 B.R. 532 (Bankr. S.D.N.Y. 2007) (treating debtor as being in default after she had cured under her plan violated the discharge injunction).

In addition, and as also noted above, Ocwen's *Complaint for Foreclosure*, filed on August 15, 2018 in Cause No.29D03-1808-MF-007526 [Filing No. 84-12], was also in violation of § 524 as it sought a money judgment against Freeman and included amounts subject to the analysis above: "That Plaintiff **be awarded judgment personally** against Demona A. Freeman, AKA Demona Ann Freeman, AKA Demona Freeman in the principal

---

[12] Section 524(a)(2) of the bankruptcy code provides that a discharge of debt in a bankruptcy proceeding "operates as an injunction against the commencement **or continuation of** ... an act[] to collect ... any such [discharged] debt … ." 11 U.S.C. § 524(a)(2) (emphasis added).

amount of $88,039.35 together with all accrued interest thereon as provided in the note and together with all late charges, expenses, advances and other amounts due and owing thereunder, including reasonable attorney fees and the costs of this action." [Filing No. 84-12] at ¶ 15 (emphasis added). This filing was also plainly in violation of the discharge injunction. *See, e.g.*, *In re Lempesis*, 557 B.R. 659 (2016) ("[The Respondents again violated the discharge injunction by filing the second [foreclosure] lawsuit…[which] was nearly certain to cause emotional distress").

> iii.   There is no fair ground of doubt as to whether Ocwen's post-discharge credit reporting was in violation of 11 U.S.C. § 524 and did not "merely seek to enforce its lien."

Following the entry of the Order of Discharge, Ocwen immediately began and thereafter continued reporting the Loan as being in default to the credit bureaus. *See* Ocwen_Freeman 003568 [Filing No. 83-2] (on January 7, 2018, Ocwen reported the Loan to the Credit Bureaus as 180+ days delinquent and with a past due balance of $9,109). This conduct, serving no purpose other than to coerce payment from Freeman *herself* for amounts she did not owe, has been found to be violative of Section 524. *See In re Adams*, 2010 WL 2721205 (Bankr. E.D. N.C. July 7, 2010) (finding Ocwen in contempt of discharge injunction, entering sanctions, awarding damages in relation to its post-discharge reporting of loan as in default); *see also In re Goodfellow*, 298 B.R. 358 (Bankr. N.D. Iowa 2003) (reporting of debt as ninety days past due violated discharge injunction). There is simply no rational basis for how this reporting could in any way be associated with Ocwen's stated purpose of "enforcing its lien."

> iv.   There is no fair ground of doubt as to whether Ocwen's
> post-discharge calls and collection letters were in violation of 11
> U.S.C. § 524 and did not "merely seek to enforce its lien."

Also following the entry of the Order of Discharge, Ocwen began making collection calls and sending statements to Freeman alleging she was delinquent. *See, e.g.*, Ocwen_Freeman 000130-000139 [Filing No. 83-1]; Ocwen_Freeman 0003013-003014 [Filing No. 83-1]; [Filing No. 83-39]; and [Filing No. 83-40]. These calls and letters each contained false allegations of delinquency and were entirely unrelated to Ocwen's lien. *In re Todt*, 567 B.R. 667 (Bankr. D.N.H. 2017); *In re Scott*, 2015 WL 9986691 (Bankr. N.D. Okla. July 28, 2015) (held mortgagee creditor willfully violated section 524 by sending statements to debtors alleging they were delinquent after debtors had received a discharge and trustee had filed a Rule 3002.1(f) notice stating that debtors were postpetition current); *In re Culpepper*, 481 B.R. 650 (Bankr. D. Or. 2012) (repeated unwanted calls about mortgage debt violated discharge injunction); *Forson v. Nationstar Mortg., LLC* (*In re Forson*), 583 B.R. 704 (Bankr. S.D. Ohio 2018) (finding that a mortgage creditor's actions in failing to correct its records following the Chapter 13 discharge to reflect the debtor's mortgage as current, and the mortgagee's actions in sending letters to debtor after the discharge that contained improper and uncollectible amounts from the debtor, violated the discharge injunction).

Ocwen argues that its correspondence and communications with Freeman were not coercive to pay her discharged debts because "pursuant to [Ocwen's] written policies and procedures, all correspondence and/or communication with Plaintiff was required to contain disclaimers that if she was involved in active Bankruptcy or her obligation had been discharged, the correspondence/communication was for informational purposes only while

PHH sought to enforce its lien." [Dkt. 56 at 23]. However, merely including boilerplate language that a correspondence or communication is for "informational purposes only" and "not an attempt to collect a debt" is not enough to save the correspondence from being improperly coercive if other circumstances concerning the correspondence suggest an attempt to coercively collect discharged obligations from debtors. *See In re Todt*, 567 B.R. at 678-79.

In *In re Todt*, the debtors received their Order of Discharge from bankruptcy in January of 2012. However, servicing of their mortgage was transferred to Ocwen on April 2, 2012, and beginning just ten days later and lasting through December of 2013, Ocwen sent twenty-one monthly statements to debtors indicating that their mortgage was past due. The monthly statements contained language reflecting the "Current Amount Due" as well as amounts Ocwen alleged to be past due and stating "Past Due Amounts DUE IMMEDIATELY," with such amount growing with each monthly statement. The monthly statements also each contained a detachable payment coupon that listed the "AMOUNT DUE" as the total amount due consisting of both the current amount due and the past due amount. In addition, the monthly statements contained boilerplate disclaimer language, including "Our records indicate that your loan is in foreclosure. Accordingly, this statement may be for informational purposes only" and "If you or your account are subject to a pending bankruptcy or the obligation referenced in this statement has been discharged in bankruptcy, this statement is for informational purposes only and is not an attempt to collect a debt."

The debtors ultimately reopened their bankruptcy case and filed an adversary proceeding against Ocwen, alleging it willfully violated the discharge injunction set forth in

11 U.S.C. § 524(a)(2) in sending the twenty-one monthly statements. Like in this matter, Ocwen argued therein that the monthly statements did not violate the discharge injunction because they contained the boilerplate bankruptcy-related disclaimers and thus, did not objectively coerce or harass the debtors to pay a discharged debt. The court disagreed. The court examined the totality of the twenty-one communications and the language contained therein, finding that all such communications "expressly and implicitly reflect[ed] attempts to collected discharged obligations from the debtors." *In re Todt*, 567 at 679. The court went on to explain:

> No pro forma bankruptcy disclaimer can overcome the effects of repeated and continuous communications in which Ocwen took the position that these obligations were collectible. The use of a pro forma bankruptcy disclaimer is not a "get out of jail free" card that can absolve a creditor of liability for a pattern of conduct that is inconsistent with the terms of the disclaimer itself.

*Id.* Thus, the court ultimately determined that the twenty-one statements improperly coerced and harassed the debtors in violation of the discharge injunction. *Id.*

Here too, Ocwen mailed numerous collection calls to Freeman and sent Freeman numerous written correspondence after her Order of Discharge which reflected a growing past due amount, with the "Due Date" described as "Due Now." *See, e.g.*, Ocwen_Freeman 000130-000139 [Filing No. 83-1]; Ocwen_Freeman 0003013-003014 [Filing No. 83-1]; [Filing No. 83-40]; [Filing No. 83-39]. Each of these written statements likewise contained a payment coupon, reflecting the total past due amount alleged by Ocwen and the very same boilerplate disclaimers as those in *In re Todt* indicating the respective correspondence *may* be for informational purposes if she was involved in active bankruptcy or her obligation had been discharged - despite knowing full-well at the time of such correspondence that her alleged obligations had been discharged or disallowed. *See, e.g.*, Ocwen_Freeman

000130-000139 [Filing No. 83-1]. Like in *In re Todt*, the cumulative effect of Ocwen's numerous collection calls and collection letters to Freeman, coupled with the misleading language therein that implicitly attempted to collect on amounts discharged in Freeman's bankruptcy, evidence a "pattern of conduct that is inconsistent with the terms of" the pro forma disclaimers buried in the fine print at the end of such communications. *See In re Todt, 567 at 679*. Thus, the Court should find, like in *In re Todt*, that Ocwen's calls and collection letters to Freeman post-discharge had the practical effect of coercing Freeman to pay discharged debts in violation of her discharge injunction.

### C. In Addition to Finding it in Contempt, the Court Can and Should Sanction Ocwen.

Under traditional principles of equity practice, courts have long imposed sanctions to "coerce the defendant into compliance" and punish them for their misdeeds. *Taggart*, 139 S. Ct. at 1801 (citing *United States v. Mine Workers., 330 U.S. 258, 303-304, 67 S. Ct. 677,(1 L.Ed. 884 (1947)*); *see also* 3 William L. Norton Jr. & William L. Norton III, Norton Bankruptcy Law and Practice § 58:2 (3d ed. 2017) (A majority of courts also allow sanctions that are punitive in nature…."); *Romanucci & Blandin, LLC v. Lempesis, No. 16 C 9710, 2017 WL 4401643, at *6–7 (N.D. Ill. May 4, 2017)*; *In re Nibbelink, 403 B.R. 113 (Bankr. M.D. Fla. 2009)* (sanctions that are punitive in nature allowable for post discharge attempts to collect fees not permitted by Chapter 13 plan). The Supreme Court has explained that such sanctions are warranted in cases involving bad faith or a party's "record of continuing and persistent violations." *Taggart*, 139 S. Ct. at 1802.

Here, Ocwen argues it should not be sanctioned because it purportedly corrected the "singular human error" it contends resulted in the actions in dispute. Thus, Ocwen posits

that it has acted in good faith and requires no further "coercion" to comply.[13] However, as detailed below, Ocwen's prior knowledge of its widespread failure to adhere to the requirements of Chapter 13 bankruptcy proceedings (including without limitation Section 524), its refusal to take corrective measures in the face of that knowledge and frequent disputes from Freeman, and the frequency in which it has been alleged to have engaged in (and paid significant sums of money in relation to) nearly identical conduct elsewhere, plainly evidence willfulness and bad faith.

       1.   <u>Ocwen's long-standing knowledge of its widespread failure to comply with the requirements of Chapter 13 bankruptcies evidences bad faith.</u>

Ocwen does not argue that its actions were not willful but does contend there is no evidence it acted in bad faith. [Dkt. 56 at 27]. Ocwen's own Risk Convergence Reports and the regulatory actions to which it was a party, demonstrate Ocwen has long possessed knowledge of its widespread failure to adhere to the requirements of Chapter 13 bankruptcies, yet willfully allowed its conduct to continue. *See* Ocwen_Freeman 006925, attached to Appendix as ***Exhibit F* (sealed)**. For example, but without limitation, one such regulatory action resulted in Ocwen entering a Consent Order with the United States and 49 States regarding its mortgage servicing practices ("2014 National Consent Judgement") [Filing No. 83-7]. Exhibit A to the 2014 National Consent Judgement contains what is commonly referred to as the National Mortgage Servicing Standards. *See* [Filing No. 83-7]. These standards required Ocwen to ensure that in all Chapter 13 cases:

         "a. prompt and proper application of payments is made on account of (a) pre-petition arrearage amounts and (b) postpetition payment amounts and posting thereof as of the successful consummation of the effective confirmed plan; b. the debtor is treated as being current so long as the debtor is making

---

[13] Ocwen overlooks that "coercion to comply," the question of reprehensibility, applies not only to repeated acts against the same person "but also recidivism" - similar violative conduct at large. *See Saccameno v. Ocwen Loan Servicing*, 943 F.3d 1071 (7th. Cir. 2019).

payments in accordance with the terms of the then effective confirmed plan and any later effective payment change notices; and c. as of the date of dismissal of a debtor's bankruptcy case, entry of an order granting Servicer relief from the stay, or entry of an order granting the debtor a discharge, there is a reconciliation of payments received with respect to the debtor's obligations during the case and appropriately update the Servicer's systems of record. In connection with such reconciliation, Servicer shall reflect the waiver of any fee, expense or charge pursuant to paragraph III.B.1.c.i or III.B.1.d."

The standards also required Ocwen to accurately respond to notices of final cure required under Rule 3002.1. Thus, this regulatory action provided Ocwen with specific knowledge of these issues, the very same issues now in dispute, long before Freeman's exit from bankruptcy. This evidences willfulness and bad faith and justifies the entry of sanctions.

### 2. Ocwen's record of "continuing and persistent violations" evidences bad faith.

"This is [far] from the first time Ocwen has appeared before the Court [or bankruptcy courts of other jurisdictions] for improperly administering a loan in bankruptcy or attempting to collect fees and costs to which it was not entitled." *In re McKain*, No. 08-10411, 2009 WL 2848988, at *5 (Bankr. E.D. La. May 1, 2009). In fact, it has displayed a "continuing disregard for bankruptcy law and procedure," and has "consistently shown an inability or refusal to comply with [] basic statutory tenets." *Id.* This conclusion is certainly supported by the number of nearly identical similar disputes brought against it by debtors from across the country. *See, e.g. Saccameno v. Ocwen Loan Servicing*, 943 F.3d 1071 (7th. Cir. 2019); *Roger Todd v. Ocwen Loan Servicing, LLC, et al.*, No. 2:19-cv-0085-JMS-DLP (S.D. Ind.); *In re Fivecoate*, 34 B.R. 720 (Bankr. D.S.C.); *In re Schafer*, No. 07–61297–13, 2013 WL 1197612 (Bankr. D. Mont. Mar. 25, 2013); *In re Green*, No. 12-13410, 2014 WL 1089843 (N.D. Ohio Mar. 19, 2014); *Englert v. Ocwen Loan Servicing*, 495 B.R. 266 (Bankr. W.D. Pa. 2013); *In re Alley*, No. 09-21500, 2014 WL 2987656 (Bankr. D. Me. July

1, 2014); *In re Stambaugh*, 531 B.R. 191 (Bankr. S.D. Ohio 2015); *Best v. Ocwen Loan Servicing, LLC*, No. 15-cv13007, 2016 WL 125875 (E.D. Mich. 2016); *In re Adams*, 2010 WL 2721205 (Bankr. E.D. N.C. July 7, 2010).

Despite the foregoing, Ocwen bombarded Freeman for well over a year with a stream of unlawful collection activities, including two attempts to advance foreclosure proceedings. Ocwen's extensive history of violations similar to those at issue here is evidence that it has acted in bad faith. Thus, there is at least a genuine factual issue as to Ocwen's contempt.

## D. Freeman is Entitled to Relief and Requests this Matter be Set for an Evidentiary Hearing.

Under traditional principles of equity, courts have long imposed sanctions to "'compensate the complainant for losses' stemming from the defendant's noncompliance with an injunction." *Taggart*, 139 S. Ct. at 1801 (quoting *United States v. Mine Workers.*, 330 U.S. 258 (1947)).[14] Ocwen argues Freeman is not entitled to relief because she allegedly has unclean hands, because it "remove[d] the disallowed amounts from the Loan" before the initiation of these proceedings, and because she has suffered "absolutely no losses" as a result of its conduct. Momentarily setting aside the fact these arguments require turning a blind eye to Ocwen's conduct during the fourteen months between the Order of Discharge and January 3, 2019, it simply does not hold water from a factual or legal perspective.

### 1. Freeman does not have unclean hands.

---

[14] The standard set forth in *Taggart*, *supra*, for the imposition of civil contempt sanctions against a creditor who attempts to collect a debt in violation of a chapter 7 bankruptcy discharge order has since been found applicable in the context of other chapters of the Bankruptcy Code. *See, e.g., Beckhart v. Newrez, LLC*, 31 F.4[th] 274, 277 (4th Cir. 2022) (Chapter 11); *In re Pope*, 647 B.R. 597, 624 (Bankr. D.N.H. 2022) (Chapter 13); *In re Seaver*, 640 B.R. 555, 557 (Bankr. D.S.C. 2022) (Chapter 13).

In various sections of its *Memorandum In Support of Summary Judgment*, Ocwen makes a series of wholly unfounded representations designed to create a false narrative that portrays with unclean hands and having acted with "nefarious intent." Specifically, Ocwen asserts, among other things, that Freeman has "reap[ed] the benefits of living free in her property at PHH's expense" [Dkt. 56 at 2], that she can resume making her monthly payments at any time but has chosen not to [Dkt. 56 at 25], that she "has materially benefitted from her wrongful conduct" [Dkt. 56 at 27], that she is "pursu[ing] multiple avenues of litigation in hopes of obtaining a financial windfall" [Dkt. 56 at 2], and that she somehow delayed in seeking relief. Ocwen then conflates these drive-by insinuations into an argument that unclean hands bar Freeman's request for equitable relief.

Ocwen's argument that Freeman has unclean hands is premised on the disingenuous assertion that its own hands are clean because it "fixed" its "accounting error" between November 23, 2018, and January 3, 2019 and, as such, Freeman could resume making her monthly payments at any time but has "knowingly and purposefully" refused to pay her mortgage for over four years with "no legitimate basis for her failure to pay her mortgage." [Dkt. 56 at 27]. The record demonstrates that the first premise of this argument is false. Though it is true that on January 3, 2019, Ocwen waived the previously assessed foreclosure costs and fees, Ocwen reassessed them to the Loan just five days later. *See* SAFND ¶ 31 (citing Patterson Expert Report ¶¶ 83 and 97 [Filing No. 83-25]). Those fees and costs, as well others, remain on the Loan. *Id*. Further, Ocwen continues to assess improper fees and costs to the Loan in the form of an advance balance. *See* SAFND ¶ 36 (citing Ocwen_Freeman004832 [Filing No. 83-4]). As of December 31, 2019, this advance balance was $44,462.89. *Id*. If Ocwen had truly corrected the numerous errors plaguing Freeman's

Loan and thus had "clean hands," her Loan would not continue to this day to be in a manufactured state of default, as is clearly demonstrated by the record.

In support of its argument that Freeman has "unclean hands," Ocwen claims that for the past four years, Freeman has intentionally refused to pay her mortgage despite the fact that she could allegedly "resume[] making payments" at any time. However, as detailed above, despite numerous attempts by Freeman to make a monthly mortgage payment, her payments were repeatedly rejected, misapplied, and/or held in suspense without application. *See, e.g.*, SMFD ¶ 3 (citing Verdooren AP Decl. ¶ 22 [Filing No. 83-41]); SMFD ¶¶ 11, 15; SAFND ¶¶ 26. Ocwen also refused to accept payment of less than the full reinstatement amount because it considered the Loan in default and never notified Freeman she could resume making her monthly payments. *See* SMFD ¶¶ 3-4; *see also* Freeman Declaration ¶ 54 [Filing No. 83-20]. The suggestion that Freeman has been "knowingly and purposefully" refusing to make payments toward her Loan, and as such, has been living free in her house at Ocwen's expense or otherwise reaped any benefit from this ordeal is, therefore, preposterous. For this to be true, Ocwen would have to waive the collection of all unpaid amounts, as well as associated fees and interest, and reverse the charges improperly assessed to Freeman, which of course it has not done, and nothing in Ocwen's brief or its designated evidence suggests any intent to do so. It is dishonest for Ocwen to argue that Freeman is profiting at Ocwen's expense while Ocwen maintains improper charges on Freeman's account and holds her hostage under a continuing threat of wrongful foreclosure.

Most importantly, Ocwen does not even make any pretense of satisfying its burden of establishing the absence of an issue of material fact on this defense. Unclean hands is an affirmative defense on which Ocwen bears–and fails to carry–the burden of proof. *See*

*Continental Bank, N.A. v. Modansky*, 129 B.R. 159, 164 (N.D. Ill. 1992) ("[U]nclean hands is an affirmative defense, and the burden of making sufficient allegations is on the party asserting it."). Ocwen has not designated sufficient evidence to support this affirmative defense, and it, therefore, fails as a matter of law and should be stricken. *See, e.g., Dwyer Instruments Inc. v. Sensocon Inc.*, 2012 WL 3207254, at *19 (N.D. Ind. Mar. 23, 2012) (defendants failed to present evidence upon which a reasonable jury could find that plaintiff acted with unclean hands, entitling plaintiff to summary judgment). This wholesale absence of any such effort to meet its burden suggests that Ocwen's true intent in littering these false allegations throughout its Memorandum is to disparage Freeman and misrepresent her numerous and continued efforts to have her Loan corrected and properly reinstated.

   2.   <u>The Court can and should award relief to Freeman for her losses in an amount to be determined at trial.</u>

In addition to employing the unique strategy of attacking Freeman's integrity, an approach it will no doubt abandon should this matter proceed to trial, Ocwen commits considerable ink to the proposition that Freeman has experienced *absolutely no loss or hardship* as a result of its actions. This is patently absurd. The record contains ample evidence to proceed to trial on the question of damages.

For instance, the bankruptcy court may award emotional distress damages. *See Aiello v. Providian Fin. Corp.*, 239 F.3d 876, 880 (7th Cir. 2001) (bankruptcy courts may award emotional distress damages as compensation for violations of the automatic stay if the debtor also shows a financial loss); *Romanucci & Blandin, LLC v. Lempesis*, 2017 WL 4401643 (N.D. Ill. May, 2017) (rejecting attempt to distinguish *Aiello* on the grounds that *Aiello* dealt with violations of the automatic stay rather than violations of the discharge injunction, holding debtor entitled to emotional distress damages). Freeman testified that she

experienced significant stress because "I knew that my home was in foreclosure, and I knew that . . . nobody never did anything to try to stop it. I knew that the payments were not put in correctly. I knew the escrow was incorrect. So that's not an on-and-off thing." Demona Freeman Dep. 113:18-25 [Filing No. 83-15]. She also testified that she experienced specific stress due to specific communications she received from Ocwen because she knew they were lies. Demona Freeman Dep. 114:3-10 [Filing No. 83-43]; *see also* Freeman Declaration ¶ 41 [Filing No. 83-20] (Ocwen's responses to her NOE's and RFI's caused Freeman to feel extremely hopeless that Ocwen would correct its mistakes, remove her Loan from being in a manufactured state of default, and allow her to resume making her monthly payments). Freeman also suffers physical manifestations of the emotional distress caused by Ocwen's statements and default letters, which have caused Freeman such anxiety, stress, and frustration that she experienced light-headedness, pounding in her chest, difficulty breathing, nausea, and trembling. Freeman Declaration ¶¶ 43, 57 [Filing No. 83-20].

Attorney fees are also an appropriate element of damages. *See Loewe v. Weltman, Weinberg & Reis Co., L.P.A.*, No. 19-12187, 2020 WL 409655, at *4 (E.D. Mich. Jan. 24, 2020) (finding that legal costs incurred by the plaintiff to contest an allegedly invalid debt constituted "actual" and "real" injuries). Freeman should be afforded the opportunity to present evidence of fees incurred to contest Ocwen's wrongful conduct, including without limitation those in relation to its post-bankruptcy foreclosure filings.

3.  The Court can award "make-whole relief" in an amount and form to be determined at trial.

With regard to the forms of relief Freeman seeks, Ocwen accuses her of treating this Court as "a grab-bag . . . to reach into in hopes of a windfall if she is unsuccessful in obtaining relief in the District Court litigation." [Dkt. 56 at 26 n.6]. Once more, these insults

are wholly unsupported by fact or law. Foremost, Freeman is absolutely entitled to seek, and the Court may absolutely provide, "make-whole relief." *See, e.g., In re Griffin*, 415 B.R. 64, 71 (Bankr. N.D.N.Y. 2009) (violation of the discharge injunction does not give rise to statutory damages; rather, courts use their inherent civil contempt power under § 105 to provide a remedy, and any monetary relief awardable is in the form of sanctions, not damages); *Goya Foods, Inc. v. Wallach Mgmt. Co.* 290 F.3d 63, 78 (1 Cir. 2002) ("In a civil contempt proceeding, a monetary sanction, assessed for the purpose of compensating the complainant for losses sustained by reason of the contemnor's acts, is within the universe of permissible sanctions. Thus, make-whole relief is a commonplace sanction in civil contempt.").

In *Adams*, *supra*, Ocwen was found in contempt for violating the terms of a discharge injunction and corresponding order after repeatedly reporting the chapter 13 debtors' loan as being in foreclosure when it was not. 2010 WL 2721205 (Bankr. E.D. N.C. July 7, 2010). Ocwen also continued to assess discharged principal, fees and costs, and "did so, knowingly, over a prolonged period of time even after such violations were brought to its attention. . . " *Id*. at *3. The debtors suffered harm in that, among other things, they were unable to refinance their home at market rates because Ocwen erroneously reported their loan as being in foreclosure, and they incurred attorneys' fees attempting to rectify Ocwen's errors and bringing the matter to the court's attention. *Id*.

Noting its inherent authority to issue sanctions to enforce the discharge order and the discharge injunction, the bankruptcy court imposed a variety of sanctions, including compensatory damages, consisting of attorneys' fees, reimbursement for an appraisal in connection with the failed refinancing, and compensation for the debtors' time and "the

embarrassment of having false, defamatory information published about them." *Id*. at *6. As part of the compensatory damage award, the court also recalculated the debtors' mortgage balance at a market rate because Ocwen's improper reporting had prevented them from refinancing. *Id*. Finally, the court found it "not only appropriate to award punitive damages, but necessary" because "Ocwen has given every indication that it is and will remain indifferent to the statutory significance of the discharge injunction and [the discharge] order, unless it is compelled to take note." *Id*. The court assessed $66,300 in punitive damages, representing $100 per day from the date on which Ocwen was served with the debtors' motion to show cause through the of the court's order. *Id*.

Likewise, Freeman is entitled to be made whole. This would include, at a minimum, an order (1) requiring Ocwen to modify the Loan so as to waive all "unpaid" interest and fees, allow Freeman to recommence making single monthly payments, provide Freeman with a rate of interest commiserate with what she would have been able to obtain but for Ocwen's actions, and (2) granting leave to undersigned counsel to submit a petition for attorney fees and costs.

### E. The Doctrine of Equitable Estoppel Mandates Ocwen Be Estopped From Continuing to Hold the Loan in Default or Collecting Amounts Stemming Therefrom.

Buried beneath Ocwen's attempt to recast its conduct as a "mistaken belief" are the misrepresentations it made within its *Response to Notice of Final Cure* and to Freeman following entry of the Order of Discharge. As a result, the doctrine of equitable estoppel mandates Ocwen be estopped from treating the Loan as if it is in default and seeking to collect amounts owed based upon its misrepresentations. The traditional elements of equitable estoppel are: (1) misrepresentation by the party against whom estoppel is asserted; (2) reasonable reliance on that misrepresentation by the party asserting estoppel; and (3)

detriment to the party asserting estoppel. *See In re Larson*, 862 F.2d 112, 115 (7th Cir. 1988) (quoting *United States v. Asmar*, 827 F.2d 907, 912 (3rd Cir.1987)). The doctrine derives from one core "underlying principle": the equitable intuition that "one who by deed or conduct has induced another to act in a particular manner will not be permitted to adopt an inconsistent position, attitude, or course of conduct that causes injury to such other." *Town of New Chicago v. City of Lake Station ex rel. Lake Station Sanitary Dist.*, 939 N.E.2d 638, 653 (Ind. Ct. App. 2010) (citing *Brown v. Branch*, 758 N.E.2d 48, 51 (Ind. 2001)).

As stated above, Ocwen's *Response to Notice of Final Cure* indisputably contained the materially false representation that "[Freeman has] paid in full the amount required to cure the prepetition default on the creditor's claim[]" at a time its internal records reflected she was eight months delinquent. *See* SAFND ¶ 13 (citing Patterson Expert Report ¶ 27(a) [Filing No. 83-25]). Thereafter, representatives of Ocwen made indisputably false representations regarding past-due amounts Freeman allegedly owed, including but not limited to via its foreclosure filings, via its representatives during various calls with Freeman, as well as via its dunning letters and other written correspondence to Freeman. *See*, *e.g.*, *supra* Section V(C)(3)(ii)-(iv). Freeman reasonably relied on these representations, as did her bankruptcy counsel, in making timely and adequate monthly payments thereafter until Ocwen refused to accept them.

This is precisely what was encountered in *In re Fivecoate*, 634 B.R. 720 (Bankr. D.S.C. 2021). In *In re Fivecoate*, in the debtor's chapter 13 bankruptcy, PHH, as successor to Ocwen, filed a Response to the Trustee's Notice of Final Cure sometime after February 3, 2021, acknowledging therein that the prepetition amount had been cured pursuant to the terms of the debtor's Chapter 13 Plan and asserting that the debtor's account was

contractually due for November 1, 2020. The crux of the dispute centered on certain post-petition payments which were not made by the debtor in reliance upon PHH's misrepresentation that payment was not due because the debtor was paid ahead on the loan. PHH treated the loan as current until nearly two years later when it filed the Response, alleging that the debtor had not made post-petition payments during that period. The debtor argued that PHH should be equitably estopped from collecting amounts asserted as due in the Response. The court agreed.

In reaching this conclusion, the court discussed the unequal position of the parties noting, "[t]he mortgage creditor, as a sophisticated party who handles the collection and servicing of a large volume of mortgage loans, is in a far better position to properly account for the application of payments than a consumer debtor." *Id.* at *726-727. The court found PHH's conduct "clearly and blatantly mislead [the debtor]" noting, "PHH not only provided correspondence with the incorrect next due date, but its representatives also repeatedly and directly advised Debtor that it was not necessary to make further post-petition payments during that period." *Id*. at *726. The court rejected PHH's argument which, in effect, was that the debtor "should have known better than to believe or accept what PHH representatives communicated to her about the loan." *Id*. at *728.

The court also addressed PHH's delay in correcting its misrepresentation, noting nearly two years passed from when PHH and its representatives made the misrepresentations to the debtor until the filing of its Response. The court emphasized that PHH's failure to timely correct its own errors left the debtor "with few options to cure or otherwise address the payments" and unnecessarily caused delay in the debtor's discharge which further prejudiced the debtor.

The conduct of PHH in *In re Fivecoat* is almost identical to the conduct at issue here. Ocwen made material misrepresentations of fact concerning the status of the Loan. *See Response to Notice of Final Cure* [Filing No. doc]. As reflected in Ocwen's *Response to Notice of Final Cure*, Freeman made all payments required of her to cure the pre-petition amount owed and was current with all post-petition payments. *Id.* [Filing No. doc]. Thereafter, Freeman began making payments directly to Ocwen in reliance upon the representation in its *Response to Notice of Final Cure* that the status of the Loan was current. *Id.* [Filing No. doc]. Like the debto*r* in *In re Fivecoat*, Freeman did not make any payments above and beyond what was represented to her as due and owing. To the extent the Loan was not current, Ocwen's failure to timely correct its misstatement has prejudiced Freeman. Had Ocwen represented that the Loan was not current in its *Response to Notice of Final Cure* or any time prior thereto, Freeman would have had addressed the contention prior to exiting from bankruptcy and would have avoided Ocwen's subsequently declared delinquency. The delay in corrective action cannot be overlooked. Even in *In re Fivecoat* where PHH's corrective action was taken at the end of the bankruptcy (on the eve of the debtor receiving a discharge), the court found such action prejudicial to the debtor because it left the debtor with few options to cure or otherwise address the payments that PHH claimed were then outstanding. *In re Fivecoate*, 634 B.R. at 729. Here, arguably greater prejudice has occurred based upon Ocwen's representation and subsequent action taken. As a result, Freeman was without any option to cure or otherwise address Ocwen's contention that Freeman was not current on the Loan once Freeman exited from bankruptcy because Ocwen represented that the Loan was delinquent only after entry of the Discharge Order. Furthermore, had Ocwen not represented that the status of the Loan was current, which took

Freeman out of the purview of bankruptcy court, Freeman would not have recommended making payments directly to Ocwen. Based on the foregoing, Ocwen is equitably estopped from holding the Loan in default and seeking amounts allegedly owed based upon this misrepresentation of material fact.

**F. Ocwen's Concurrent Violations of the Confirmed Chapter 13 Plan, F.R.B.P. 3002.1, and Orders Dated October 26, 2012 and April 8, 2013, also Warrant the Entry of Sanctions and Further Evidence Bad Faith.**

In addition to its repeated and continued violation of § 524, *et seq.*, Ocwen willfully violated the confirmed Chapter 13 Plan, the *Order on Objection to Claim* dated October 26, 2012, and the *Order Granting The United States Trustee's Motion For Determination of Post-Petition Fees, Expenses, or Charges* dated April 8, 2013. In fact, in furtherance of its misguided attempt to characterize its actions in such a way as to circumvent § 524, Ocwen openly admits to seeking to collect from Freeman the amounts specifically disallowed therein. This conduct further justifies, and independently warrants, the granting of relief to Freeman and an entry of severe sanctions against Ocwen. *See, eg.*, *In re Earl*, 140 B.R. 728, 741 (Bankr. N.D. Ind. 1992) (using § 105(a) where "Court must preserve the integrity of the Bankruptcy system and prevent [its] abus[e]...")

There is also no dispute here that Ocwen willfully violated F.R.B.P 3002.1 when it declared "under the penalties for perjury" that Freeman had paid all amounts to cure her prepetition default and was current on all post petition payments within its Response to Notice of Final Cure Payment on April 24, 2017 - despite its internal records erroneously reflecting Freeman was eight months delinquent. *See* Patterson Expert Report ¶ 27(a) [Filing No. 83-25]. This further justifies, and independently warrants, the granting of relief to Freeman and an entry of severe sanctions against Ocwen because "at its core, [Rule 3002.1] is a sanctions provision." *In re Gravel*, 6 F.4th 503, 521 (2d Cir. 2021), cert. denied

sub nom. *Sensenich v. PHH Mortg. Corp.*, 213 L. Ed. 2d 1047, 142 S. Ct. 2829 (2022). The advisory committee described subdivision (i) as "sanctions." *Id*. at 521; *see also In re Lescinskas*, 628 B.R. 377, 382 (Bankr. D. Mass. 2021) (noting that Rule 3002.1 was a sanctions provision permitting "penalties" to serve as a "sobering reminder" of the need to comply with the disclosure requirements).[15]

## VI.   CONCLUSION

WHEREFORE, Plaintiff Demona Freeman respectfully requests Defendant PHH Mortgage Corporation's Motion for Summary Judgment be denied in all respects, or that the Court affirmatively hold Ocwen in contempt for the conduct detailed above, and that this matter be calendared for trial.

> Respectfully submitted,
>
> /s/ *Travis W. Cohron*
> Travis W. Cohron, No. 29562-30
> Olivia Hess, No. 36166-49
> **Clark, Quinn, Moses, Scott & Grahn, LLP**
> tcohron@clarkquinnlaw.com
> ohess@clarkquinnlaw.com
>
> /s/ *Nick Wooten*
> Nick Wooten
> DC LAW, PLLC
> 1012 W Anderson Ln
> Austin, TEXAS 78757
> 512-220-1800
> nick@texasjustice.com
>
> ***Counsel for Plaintiff Demona Freeman***

---

[15] Given that Rule 3002.1 transplants FRCP 37's language, 3002.1's "other appropriate relief" cannot be cabined to exclude punitive damages. "When a statutory term is 'obviously 'transplanted from another source,' it brings the old soil with it." *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019). Thus, "once the evidence-preclusion penalty is properly classified as a potentially punitive sanction . . . then the 'other appropriate relief' language in Rule 3002.1 naturally includes from a textual standpoint, punitive monetary sanctions." *In re Gravel*, at 522.

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on March 31, 2023, a copy of the foregoing was filed electronically. Notice of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

               */s/ Travis W. Cohron*
               Travis W. Cohron, No. 29562-30

CLARK, QUINN, MOSES, SCOTT & GRAHN, LLP
320 N. Meridian Street, Suite 1100
Indianapolis, IN 46204